PACKER, The E. A.　See Case No. 4,241.

# Case No. 10,654.

## The PACKET.

### [3 Mason, 255.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1823.

BOTTOMRY—WHO MAY BE CLAIMANTS—NECESSARY REPAIRS—SALE OF CARGO—MARSHALLING ASSETS—LIEN ON FREIGHT.

1. In a suit in rem on a bottomry bond, underwriters, to whom an abandonment is made, which has not been accepted, are not admissible as claimants.

[Cited in The Idaho, Case No. 6,996; The Senator, Id. 12,664.]

2. In case of necessary repairs the master may sell part of the cargo, or hypothecate it.

[Cited in The Fortitude, Case No. 4,953; Roberts v. Eldridge, Id. 11,901; Pope v. Nickerson, Id. 11,274; Dupont de Nemours v. Vance, 19 How. (60 U. S.) 170; Delaware Mutual Safety Ins. Co. v. Gossler, 96 U. S. 651.]

[Cited in brief in Dunning v. Merchants' Mut. Mar. Ins. Co., 57 Me. 112. Cited in Babcock v. Terry, 97 Mass. 488.]

3. If he has money on board belonging to shippers, he is not bound to apply it to the ship's necessities before borrowing on bottomry, at least if not equal to the amount of repairs. But the law invests him with a large discretion on the subject.

[Cited in The Julia Blake, 107 U. S. 427, 2 Sup. Ct. 692.]

4. If he has sufficient money of the owners, he cannot borrow on bottomry; so, it seems, if he has of his own, on board.

[Cited in The William and Emmeline, Case No. 17,687; The Larch, Id. 8,085.]

1 [Reported by William P. Mason, Esq.]

5. Courts of admiralty will marshal the assets in case of bottomry, so as to make the proper priorities in favour of shippers, against the property of the owner and master.

[Cited in Pope v. Nickerson, Case No. 11,-274; The Panama, Id. 10,703; The Serapis, 37 Fed. 438.]

6. The decree in bottomry, is to consider the sum lent and the premium, as a principal, and to allow common interest on that sum for the delay of payment after it is due.

[Cited in The Mary, Case No. 9,189; The Archer, 15 Fed. 282.]

7. The master of a ship has a lien on the freight for all advances made abroad for the ship's use.

[Cited in The Gold Hunter, Case No. 5,513; Ex parte Clark, Id. 2,796; Pope v. Nickerson, Id. 11,274; The Eliza Jane, Id. 4,363. Cited in note in The Bowditch, Id. 1,717.]

8. Quere if not also on the ship.

[Cited in Ex parte Clark, Case No. 2,796; Pope v. Nickerson, Id. 11,274.]

9. If the property of a shipper be taken and sold for the ship's necessities and to enable her to perform the voyage, the party has a right of contribution over against the other shippers, and his remedy is not confined to the ship owner. A bottomry bond may be good in part and bad in part; and will be sustained by the court so far as it is good.

[Cited in The Boston, Case No. 1,669; The Gold Hunter, Id. 5,513; The Hunter, Id. 6,904; The Leonidas, Id. 8,262; The Bridgewater, Id. 1,865; Mutual Safety Ins. Co. v. The George, Id. 9,981; Greely v. Smith, Id. 5,750; Carrington v. The Ann C. Platt, Id. 2,445; The Archer, 23 Fed. 352.]

10. The court may, if the premium is inflamed by extortion, moderate it.

[Cited in The Hunter, Case No. 6,904.]

Libel on a bottomry bond, pledging the ship, freight, and cargo. The ship Packet with a valuable cargo on board, belonging principally to various shippers, was, on a voyage from St. Petersburg (in Russia) to Boston (in America), run down by another vessel at sea, and was so much injured, that she was compelled to put into Christiansand (in Norway) for repairs. It was then found that the ship must undergo very considerable repairs, and the master not having sufficient funds in cash, and being unable to borrow money there, instead of selling a part of the cargo, which could be done only at a great sacrifice, applied to the libellants, Messrs. Thomas Wilson & Co. at London, for an advance of the necessary funds. The libellants accordingly advanced to the master for the repairs, &c., the sum of £8,074. 13s. 9d. sterling money, and on the eve of the vessel's resuming her voyage, took a bottomry bond for £9,205. 2s. 10d. sterling, being the amount of the advances, with a premium of fourteen per cent. pledging the ship, freight, and cargo. The bond was in the usual form on the voyage of the ship from Christiansand to Boston, and the amount was payable three days after the ship's arrival at Boston, in lawful money of the United States, according to the current rate of exchange on London. The ship sailed from Christiansand on her voyage,

and safely arrived at Boston in May, 1823. But in the course of the voyage, meeting with contrary winds, she put into Portsmouth in England, and while there the master drew upon Messrs. Wilson & Co. on account of disbursements, &c. for the further sum of £378. 0s. 9d. sterling which was paid by them. For this sum as well as for that secured by the bottomry bond, the libellants prayed payment out of the ship, cargo, and freight, and admiralty process brought them within the jurisdiction of the court. The ship and cargo were sold by an interlocutory decree, and the proceeds brought into the registry. The net proceeds of the sale of the ship were $8,442.57, of the cargo $49,-428.09, and of the freight after payment of the wages $2,398.77. The amount of the bottomry bond as finally liquidated was $45,-303.88. The repairs, expenses, and premium, therefore, amounted to about five times the actual value of the ship at the end of the voyage. Various claims were interposed by shippers and others claiming a right to the cargo, and also by the New England Marine Insurance Company, which had underwritten on the ship, and to whom she had been abandoned; but the abandonment had not been accepted by them.

The cause was argued by Mr. Dorr and L. Shaw, for the libellants and by Gorham, Hubbard, Welsh, Prescott, and Webster, for the interests of certain of the adverse parties. The case is so much commented on by the court, that it is not thought necessary to give the arguments at large.

STORY, Circuit Justice (after stating the facts). This is a very calamitous and extraordinary case; and yet it seems not now disputed by the parties before the court, that the transactions have been in entire good faith. Upon these facts, the court is not called upon to express any opinion, except so far as the parties to the controversy have brought before it their particular grounds of objection. I may be permitted, however, to observe, that the case of The Gratitudine, 3 C. Rob. Adm. 240, has established, upon the most satisfactory and conclusive grounds, the right of the master in a case of necessity to hypothecate the cargo, as well as the ship and freight; and that in that case the value of the ship, when sold in England, scarcely exceeded one fifth part of the amount of the bottomry bond. There may therefore be cases, unmixed with fraud, and perhaps liable only to the imputation of an indiscreet exercise of judgment, honestly but erroneously formed, in which the master may bind the whole property far beyond the ultimate benefit to the owners, or the voyage.

The first point, which I am called upon to consider, is, whether an underwriter, who has refused to accept an abandonment, can be permitted to claim property in the ship in this court. In my opinion it is perfectly clear, that he cannot. He has not, and pre-tends not to have, any jus ad rem, or jus in re. All that can be said is, that he may ultimately have an interest in the questions here litigated. But an interest in the question forms no title to claim property in the admiralty. This court looks only to rights in the thing itself, to ownership general or special, and to such claims as are direct in the proprietary interest, such as a legal title, or jus in re, or to such as are indirect, as a lien, or jus ad rem. In respect to the latter, the court, as a court of prize, is not in the habit of giving them effect, at least as against the superior claims of captors. The claim of the New England Marine Insurance Company must therefore be rejected. Underwriters, as such, cannot litigate here as to the rights of the libellants, or the claimants. They are mere strangers, and no more entitled to be heard than any contingent debtor or creditor of either party. Objection has been taken to the conduct of the master in giving the bottomry bond, that as he had specie dollars on board, belonging (as he says) to some of the shippers, he was bound to apply this money in the first instance to the relief of the ship, before resorting to the extraordinary measure of bottomry. If he was so bound, then it is farther contended, that to this extent at least, the other shippers are entitled to relief against the bottomry-holders. I am not prepared to say, that there is any absolute rule, which compels the master at all events, and under all circumstances, to make use of monied coin of third persons, which he happens to have on board, in preference to any other mode of proceeding. The general principle is, that he is bound to act with a reasonable discretion. He is to get the necessary repairs done at as little sacrifice as is practicable. If he has money on board, and the use of that will be the least sacrifice, he ought to resort to it in the first instance. But there may be cases, in which the use of such money would be the greatest sacrifice that could be made, and the whole objects of profit in the voyage might be thereby defeated. Suppose a voyage to the East Indies or China, in which the principal outward property on board is Spanish dollars, and a disaster happens on the first passage, requiring repairs, the use of those dollars may be the most mischievous exercise of his discretion, and destroy the hopes of the voyage. In other voyages, the sale or disposal of the money on board, from its depreciation at the foreign port, or its high value at home, may be a greater loss to all concerned, than the sale of any merchandise. In all these cases therefore, much must be left to the master's discretion, and he must exercise it conscientiously for the general interest. If he acts bona fide and with reasonable care, the rights of the parties are bound up by his acts, although it should afterwards be found, that he had committed an error in judgment, and might have acted more beneficially in another manner. The court therefore cannot

lay down any such universal rule as is contended for; and especially ought it not to be laid down in any case, like the present, where the use of such money of the shippers would have been utterly insufficient to complete the repairs. Under such circumstances the master must resort to borrowing; and he has a right to consider, whether the premium upon the borrowing, is not on the whole a less sacrifice of interest, than a partial appropriation of the shipper's funds. There are no facts brought before the court in the present case, which enable me to say, that the master has acted discreetly or otherwise; and I cannot presume without evidence, that there has been a wanton abuse of authority. But the objection, if it were well founded, would not go to the destruction of the bottomry bond, but at most would only operate to diminish its validity, as a lien, to the extent of the money, which might have been appropriated, and leave it in full force for the residue. It is not here, as in courts of common law, that the bond must be good in whole or not at all. Courts of admiralty act ex æquo et bono, as courts of equity; and a bottomry bond may be held good in part and bad in part. So far as the money was properly advanced, it may be held to give a valid lien, and be dismissed as to the rest. And if the premium has been unduly inflamed from a knowledge of the master's necessities, the court may, in the exercise of a sound discretion, moderate it, or at least refuse to exert its authority to ratify it. The cases of La Ysabel, 1 Dod. 273, and The Augusta, Id. 283, are in point. The doctrine had antecedently been recognized by this court.

There is another view of this particular point which deserves consideration. In the case of a sale of part of the cargo by the master for the necessities of the ship, the sale is in the nature of a compulsive loan for the benefit of all concerned, and to enable the ship to prosecute her voyage. It bears a considerable resemblance to the case of a jettison, for the owner is deprived of his property for the common good; and to him it must be immaterial, whether the loss be by a sacrifice at sea or on shore. In the case of The Gratitudine, 3 C. Rob. Adm. 240, 264, Lord Stowell manifestly treated it as a case of contribution. His language is, "All must finally contribute in the case of an actual sale of a part;" and then adverting to the case of bottomry of the whole, which he considered as equivalent to a sale of a part, he added, "All contribute in this, as a portion of the whole value of the cargo is abraded for the general benefit, probably with less inconvenience to the parties, than if any one person's whole adventure of goods had been sacrificed by a disadvantageous sale in the first instance." This opinion is again intimated in The Hoffnung, 6 C. Rob. Adm. 383, although the facts of that case did not require its application. The same doctrine is supported by Emerigon (Emerig. Mar. Loans,

c. 4, § 9; Id. c. 12, § 4), who expressly holds, that the owner of the goods sold has a right of contribution against the owners of the goods saved, whatever may, in the event of a successful voyage, be the ultimate right of recovery over against the owner of the ship. There is also no inconsiderable weight of authority in its favour from other maritime sources. See Stev. Av. 19, 24, 28, 29; Weskett, Gen. Av. 252, 256, 259, art. 16; authorities cited in Emerig. Mar. Loans, c. 4, § 9; Consolato del Mare, cc. 104, 105; Abb. Shipp. pt. 3, c. 8, §§ 5, 8. Whether this right of contribution would entitle the party to the full benefit of having it deemed a general average for all purposes, or whether the loss by such a sale would be recoverable under a common policy of insurance, are questions, with which I do not meddle, and which may depend upon other principles. But I confess myself strongly inclined to the opinion of Lord Stowell; and sitting in the admiralty, with the whole property rightfully under the jurisdiction of the court, I should upon an application by the party, deem his right of contribution good against the other shippers, and not turn him round to a remedy exclusively against the owner of the ship, even supposing the latter might under the circumstances be made ultimately liable for the payment. But, supposing this doctrine questionable, there is another principle obligatory upon the court, and which in the present case would lead to the same results. It is clear by the general maritime law, that the party, whose goods are so sold, has a lien upon the ship and freight for reimbursement. The Consolato del Mare (chapters 105, 106), recognizes the principle; and in general the money so lent upon a forced loan is deemed to be in the nature of bottomry. Emerig. Mar. Loans, c. 4, § 9; Id. c. 12, § 4; Cleirac, Cantract Marit. c. 5, arts. 35, 36. Lord Stowell alludes to the right in The Gratitudine, 3 C. Rob. Adm. 240, 264, and says, that if the ship and freight were omitted in the literal terms of the bond, they would be liable to the extent of their value, although the cargo alone had been made amenable to the foreign lender, who has nothing to do with averages of any kind. In our own country it has been long since asserted in the admiralty courts, that money lent in a foreign port to supply the ship's necessities, constitutes a charge on the ship. Bulgin v. The Rainbow [Case No. 2,116]. And I am not aware, that this decision, though never brought before any higher tribunal, has been in practice questioned. A fortiori, a compulsory loan is entitled to such a privilege. And it appears to me, that it would be an extreme hardship to allow the master a right to elect the sale of the goods of one shipper for the general benefit, and to confine his remedy exclusively to the owner of the ship; thus giving the full benefit to the other shippers without in any measure sharing the burthen. I have no doubt, there-

fore, that under the circumstances of this case, any forced sale at Christiansand, and upon the same principles any appropriation of money on board for the ship's necessities, ought to be reimbursed by a general contribution. The posture of the case is not then changed as between the shippers by any omission so to appropriate the money. In point of fact, however, it turns out upon farther investigation, that the money of the shippers was actually expended towards the repairs. It happened in this way. After the libellants had engaged to make the necessary advances, their agent at Christiansand was out of funds, and the master upon the exigency of the moment applied the specie then in his hands to the purpose, intending to draw on the libellants for the amount, and repurchase dollars for the shippers. In the subsequent events, he was unable to procure them, and therefore remitted the amount (with some deduction) to the libellants at London, to be drawn for by the shippers in America. The bottomry bond covers the whole amount expended, and the libellants now offer the shippers liberty to draw for the amount on London, or to deduct the same from the bottomry proceeds in court. In effect therefore the money is included in the bottomry bond; and to say the least of it, the court is not inclined to displace the lien on the ship, so far as respects the money so expended, the shippers having elected to receive compensation here. The appropriation of the money was not made by the master absolutely, but sub modo; and under all the circumstances the libellants were not wrong in originally including it in the bottomry bond.

In the progress of the cause various other questions have been made, which have rendered it necessary for the court to prosecute its inquiries into the question, to whom the money on board of the ship actually belonged. It was insisted, that it belonged originally to the master, and that no real legal appropriation of it had ever been made by the master to the shippers, who now claim it. An objection was made in behalf of the shippers to the jurisdiction of the court to institute such inquiries; but I am utterly at a loss to perceive upon what ground the objection can rest. The proceeds of the whole property are in the custody of the court, and the rights of all parties claiming title to any part of them, are necessarily put in contestation. The court must work its way through these questions of title before it can arrive at any decree disposing of the property. There is in this case a broader ground to exercise the jurisdiction. It is this, that if the master has money of his own on board, sufficient for the ship's necessities, it is by no means certain, that he has a right in such case to resort to the extraordinary measure of bottomry. In case of there being money of the owner of the ship on board, it is very

clear, that he cannot resort to bottomry. And though I would not absolutely decide, that under no circumstances he could so resort, where he has sufficient money of his own on board; yet if he can, it must be in a case of a very peculiar character, and such as ought to induce the court to uphold it from great public principles. The onus would certainly lie on the master to establish such a case; and it would be listened to by the court with scrupulous hesitation. And there is good reason for adopting such a course. The master has a lien upon the freight for all the advances, which he may make on account of the ship; and can intercept it, when earned, to reimburse himself. Lane v. Penniman, 4 Mass. 91; Milward v. Hallett, 2 Caines, 77; White v. Baring, 4 Esp. 22; Hodgson v. Butts, 3 Cranch [7 U. S.] 140. He may be considered therefore as having a reasonable security for all advances not exceeding the value of the freight. By the maritime law of foreign countries, he has also a farther lien on the ship, for all advances for the ship; and there certainly seems much reason for upholding such a right. It has been indeed denied, that the common law affords him any such lien (Hussey v. Christie, 9 East, 426; Abb. Shipp. pt. 2, c. 3, § 9); though the courts of equity have shown a strong inclination to sustain it. Hussey v. Christie, 13 Ves. 594; Ex parte Halkett, 3 Ves. & B. 135; 19 Ves. 474; 2 P. Wms. 367. Our own admiralty courts have on several occasions recognized its existence and enforced it. Burgin v. The Rainbow [Case No. 2,116]; Gardner v. The New Jersey [Id. 5,233]. See, also, Emerig. Mar. Loans, c. 12, § 3, etc. However the law may be on this point, if the master having money of his own, omits to apply it pro tanto to the ship's necessities, and binds the ship and cargo by a bottomry bond valid to a certain extent, the court will exercise its discretion, and marshal the assets in favour of the shippers of the cargo, so as to bring their property last into contribution. Upon examining the evidence and documents in the cause, I am not satisfied that any, but a small part of the money, ever belonged to the master. And, taking the master's own testimony, which in the absence of all countervailing proof must be taken to be true, it is sufficiently established, that before his departure from St. Petersburg, the whole money was legally appropriated to the shippers, and was at their risk during the voyage. It was the return of adventures sent out by them, and the master had a right to separate it for this purpose. The court therefore pronounces, that Messrs. Thomas Welsh, A. Aspinwall, P. & T. Curtis, Boardman & Pope, and J. Bromfield are entitled to it as legal proprietors.

The next consideration is, how the assets are to be marshalled in paying the bottomry bond. It is said, that there is property of

the owner and property of the master on board, included in the bottomry of the cargo. My opinion is, that the property of the owner is to be first applied to the payment of the bond. In respect to the master I should hold, that if he had money of his own on board, at least so far as the shippers are concerned, the bottomry bond should be held pro tanto not to attach upon the cargo. And I at present incline also to the opinion, that the other property of the master included in the bond, ought to be applied before that of the shippers. But it may be as well to reserve any absolute opinion on this point, until the facts are ascertained by commissioners. The only remaining point is, in what manner the amount due upon the bottomry bond is to be calculated. The rule laid down by Mr. Marshall in his treatise on Insurance and Bottomry (book 2, c. 4, p. 752) is, that "if, when the risk is ended, the borrower delay payment, the common interest begins to run, ipso jure, without any demand. 'Discusso periculo, majus legitimâ usurâ non debebitur.' But this interest runs only on the principal, not on the marine interest; for this would be interest upon interest. 'Accessio accessionis non est.'" For this doctrine he cites no English authority, but relies altogether upon the civil law and Pothier and Emerigon. Poth. Gross. Avent. note 51; Emerig. Gross. Avent. c. 3, § 4; 2 Emerig. 414. The doctrine of the civil law denying compound interest, is not of universal application under the common law. The opinions of Pothier and Emerigon seem certainly opposed to allowance of interest upon the maritime premium, (commonly, but somewhat improperly, called interest); but Emerigon admits, in explicit terms, that the law and practice in France are in favour of it. Upon examining his reasoning on the subject, it is by no means satisfactory, being obviously founded upon mere motives of compassion. My opinion is, that as by the successful termination of the voyage, the maritime premium, as well as the sum lent, becomes due, the whole forms one aggregate debt, and that any delay in discharging it, ought to be followed by the allowance of common interest exactly as in other cases of debt. In making up the decree, the sum lent and the bottomry interest are to be considered as the principal, and common interest upon this amount is to be added from the time the bond became due to the time of the decree. It will become necessary to refer the cause to commissioners, to audit the accounts and ascertain the rights of the claimants, according to the principles here stated; and an interlocutory order must be passed for this purpose.

It is unnecessary to give any opinion on the point, whether the libellants are entitled to any remedy in rem for the additional sum advanced the master at Portsmouth, because the lien, if admitted, would only extend to the ship and freight, and these are exhausted by the bottomry bond. Order accordingly.

[Subsequently a claim was brought forward by Sweet & Hammond, factors, to the proceeds of certain goods, part of the cargo of the Packet. The claim was allowed, with a reference to a commissioner to ascertain and adjust the claim. Case No. 10,655.]