## THOMAS HASSAM *v.* ST. LOUIS PERPETUAL INSURANCE CO.

Where goods are sold by the captain, in order to obtain funds for repairing particular average losses, or for defraying the ordinary expenses of navigation, the loss arising from their sale must be made good by the ship-owner alone. Where, on the other hand, they are sold for the purpose of defraying expenses or repairing losses, which are themselves of the nature of general average, the loss arising from their sale, gives a claim to general average contribution.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. C. *Roselius* and *John Claiborne*, for plaintiff. *Hunton* and *Bradford*, for defendants. The judgment of the court *(Preston*, J., absent,) was pronounced by

SLIDELL, J. This case was submitted in the court below, upon the following agreed statement of facts :

"The brig Hardy sailed from New Orleans on or about the 1st October, 1849, on a voyage to San Francisco ; her cargo consisting principally of lumber and merchandise. Insurances on the freight and cargo of the vessel were effected in the various offices ; that, with the defendants, being $10,666 on freight, and $5,000 on cargo, making a total on both risks of $15,666. While prosecuting her voyage, and when about latitude 38° 42' south, and longitude 50° 17' west, the vessel encountered such tempestuous weather, and was thereby so disabled, that it was found necessary to bear away for the nearest accessible port for repairs. On the first day of February, 1850, the ship was accordingly put away for Montevideo, where she arrived on the 10th day of that month. Upon surveys and examinations, it was found that she was much strained in her seams, leaking badly, and her rudder post twisted, so as to render re-caulking necessary ; and also, a new rudder, in order to make the vessel fit to proceed on her voyage. In order to pay for the repairs and necessary expenses of the ship during her stay at the port of distress, and after having unsuccessfully attempted to raise funds by draft upon bottomry bond upon the owners, the captain was forced to sell a portion of the cargo. The value of the cargo so sold, estimated at the San Francisco prices, was $7,950 ; from which, deducting necessary and usual charges, there remained (Montevideo currency) $6,342 84, the value at Montevideo.

"It is admitted, that the vessel could not have completed her voyage without the repairs ; that the cargo would have been almost sacrificed by a sale at Montevideo ; that no means of transhipping the cargo to its port of destination presented themselves, and that it was impossible for the master to raise the necessary amount for expenses and repairs, in any other manner than by the forced sale of a portion of the cargo.

"The vessel, freight and cargo were the property of *H. H. Raymond*, agent, 8-38 ; *Joseph Curtis*, agent, 8-38 ; *Thomas Hassam*, 6-38 ; *Wm. H. Simmons*, 4-38 ; *John Meggett*, 4-38 ; *Thomas M. Meggett*, 4-38 ; *W. C. Auld*, 2-38 ; *J. Guard*, 2-38.

"The premium note for $647 59, is admitted to be yet due defendants on account of the policy, with the interest thereon.

"Two adjustments of average have been made by adjusters, at the request of the parties ; that marked 'A,' made by *R. Brenan*, representing the views of the

plaintiffs, and that marked 'B,' made by *A. Brother*, those of the defendants. Both are submitted herewith to the court.

"It is well understood that the real plaintiffs in this suit, and for whose use it is prosecuted, were the owners not only of the ship, but the cargo and freight."

By reference to the adjustments above referred to, it further appears that the money produced by the sale of the goods at Montevideo, was $1607 16 cents, exhibiting a loss on the goods by the forced sale of upwards of $6,000; that this money was disbursed, partly for purposes, which the defendants admit come under general average, to wit, port charges, pilotage, discharging cargo, provisions and wages of crew during deviation, re-loading, surveys, protests, &c.; and partly in paying the bills for repairs of the vessel, and partly for purposes of the owners of the vessel. The vessel was uninsured.

It is contended by the plaintiffs, that the whole amount of the loss sustained by the sale of the goods, should be brought into general average; while the defendants say that the measure of liability, by way of general average, is such proportion of that loss as the general average charges bear to the whole amount disbursed. The latter theory prevailed in the court below.

We have looked with some care into the decided cases and the treatises on the subject of general average, a branch of the commercial law, which is unhappily perplexed by discordant rules and subtle distinctions. The result of our examination is, that the rule of apportionment claimed by the defendants is the correct one.

It would seem, according to Emerigon, that under the Roman law, from which the modern doctrine of general average is derived, if a ship found herself incapacitated, by *vis major*, to continue her navigation, and put into a port in order to effect repairs, neither the expenses of the repairs nor of the stay entered into general average. It may be questioned whether the case, cited in the Digest, sustains his assertion, as to the expenses of the stay; but it is clear to the point, that the cost of the repairs was not so chargeable. See Meredith's Emerigon, 4, 81.

But even if the ancient doctrine was, as stated by Emerigon, it has been in modern times enlarged; and, although there is much variance in the custom of commercial nations and the views of legislators and jurists, yet most of them harmonize to this extent, that they allow some portion of the expenses thus incurred, upon the ground that putting into port, in order to repair, is a measure voluntarily taken for the general preservation.

In England and the United States, it is fully settled, by numerous decisions, that where it becomes necessary to enter an intermediate port, because the vessel, in consequence of a particular damage sustained, is unfit to prosecute her voyage; as when masts, sails, or other requisite apparel are lost in a storm, or the vessel has sprung a dangerous leak, the expenses of entering the port are a subject of general average, being considered as the consequence of a measure voluntarily taken for the preservation of the whole. In carrying out this doctrine, however, into practical details, the American and English decisions are in some respects conflicting, as in the case of wages and provisions of the crew during the delay for the purpose of repairs, which, in England, follow the expenses of the repairs themselves, while in the principal commercial States of this Union, they are allowed as general average.

But with regard to the expenses of the repairs themselves, the case is different. These are not, like the expenses of putting into the port of distress, the

consequences of an extraordinary step taken for the general benefit. They are the consequences, not of the putting in to' refit, but of the injury which the ship has sustained by the violence of the winds and waves, which loss her owners are themselves to bear, and not the owners of the cargo. The cost of such repairs is a charge imposed upon the ship by the contract of affreightment, whereby the captain and owners are bound to maintain her in a fit state for transporting the cargo to its place of destination. Of this duty the shipper has a right to demand the fulfillment, without contributing to the expense. Nor is it any answer to say that the repair of the ship is for the advantage of the shipper, because it tends to forward the voyage. It must also be remembered, that while the duty of repairing is incumbent upon the ship-owner, by virtue of the contract of affreightment, he has, on the other hand, the benefit of the merchant's obligation to wait a reasonable time for the repairs at the intermediate port, or pay full freight. It is not, therefore, without reason that Mr. Stevens, in treating of the repairs done to a ship in a foreign port where she puts in in distress, in order to enable her to complete her voyage, expresses his surprise that any discussion should have taken place on the subject of their exclusion from general average, or that their could ever have been any doubt that the owner of the ship was bound to keep his ship in repair. The idea, he observes, could only have originated in the supposition that what was eventually for the general good; that is, in this case, the arrival of the ship with her cargo, should be borne by a general contribution. See Stevens on Average, p. 42; Benecke on Indemnity, p. 193; Arnould, vol. 2, p. 906, 907; *Padelford* v. *Boardman*, 4 Mass. 551.

Of course, in these remarks, we are limiting ourselves to the case where the damage to the ship was incurred by the violence of the winds and waves; for it seems to be generally recognized, and to be consistent with reason and principle, that if a vessel necessarily goes into an intermediate port, in consequence of an injury, which is itself the subject of general average, as, for example, masts cut away ; such repairs, as are necessary to repair that injury, are to be considered as general average.

Having thus considered the general doctrine, touching the expenses of going into port of distress and the expenses of the repairs, it is necessary now to consider the consequences of a sale of goods effected at the port of distress, in order to defray such expenses.

It is an indisputable doctrine in commercial law, that in cases of absolute necessity, when the master, being in a foreign port, has no other means whatsoever of raising money to defray indispensable expenses incurred for the necessities of the ship, he may sell part of the cargo for the purpose of procuring funds. The right has been correctly said to be sanctioned by the earliest and most recent codes of maritime law, and by the jurisprudence of our own country.

When a loss is incurred by a sale thus made, that is to say, when the goods have been sold below the rate which, making the usual allowances, they would have produced at the port of destination, on whom is this loss to fall?

In order that this question may be answered consistently with the principles already stated, it seems to us indispensable to consider the respective purposes for which the funds thus raised were necessary. And when that is ascertained, the equitable and true rule seems to us to be, that so much of the expense of raising the funds, namely, in this case the loss upon the goods sold, as is proportionate to the sum actually necessary for those purposes which were proper subjects of general average, should be admitted in the account of general average; and

HASSAM
    *v.*
ST. LOUIS PER-
PETUAL INSUR-
ANCE CO.

HASSAM
v.
ST. LOUIS PER-
PETUAL INSUR-
ANCE CO.

that, on the other hand, so much of that expense, or loss, as is proportionate to the sums necessary for purposes of particular average, should be borne by the particular interest. 'It is a gross abuse,' says Mr. Benecke, 'when, as is sometimes done, the whole charges for obtaining funds, such as marine interest, &c., are passed to the general average account, although a part of those funds have been employed for a particular average on the vessel, or for the restitution of other partial damages. This also applies to commissions of agents and attorneys, surveyor's fees, broker-age, postage and other similar charges. So much,' he observes, ' of the charge of procuring funds, as corresponds with the sum actually employed for the pur-poses of general average, and no more can be admitted.' Benecke on the Principles of Indemnity, p. 244, London edit. of 1824.

In a subsequent chapter of the same work, wherein he treats particularly of money raised abroad for the purposes of the voyage, and its relation to average, he remarks : 'If the sale of goods be effected for reasons which constitute a general average, it cannot be doubted that a general contribution must take place, whether the ship and cargo reach their destination or be lost. If the cause of sale be a mixed one, that part will be made good by general average contribution, which was applied to disbursements of that kind, and the owners will be person-ally liable for the remainder.' Ibid. p. 273.

Mr. Arnould, in his admirable Treatise on the Law of Marine Insurance, adopting the views of Mr. Benecke, states, that in his opinion, the law of England on this subject is, that where goods are sold by the captain, in order to obtain funds for repairing particular average losses, or for defraying the ordinary expenses of the navigation, the loss arising from their sale must be made good by the ship-owner alone, who must, in such case, pay the merchant the price which the goods would have fetched at their place of destination, deducting therefrom the freight which would have been due for their conveyance. Where, on the other hand, they are sold for the purpose of defraying expenses or repairing losses, which are themselves of the nature of general average, the loss arising from their sale gives a claim to general average contribution. Arnould, 2, p. 893.

It is true, Mr. Kent, in treating of the subject of general average, remarks: ' If part of the cargo be sold for the necessities of the ship, it is in the nature of a compulsive loan for the benefit of all concerned, and bears a resemblance to the case of Jettison ; and if the ship be afterwards lost, the goods saved must contri-bute towards the loss of the goods sold, equally as if they had been thrown over-board to lighten the vessel. In such a case, a portion of the cargo, according to Lord Stowell, is abraded for the general benefit.' Kent. vol. 3, p. 241.

In this general enunciation, that eminent author does not designate the nature of the necessities, to meet which, the sale effected will draw with it as a conse-quence the right of a contribution from goods saved ; and, moreover, he sup-poses the subsequent loss of the vessel.

In view of the qualified terms, in which Mr. Kent speaks of the right of contri-bution in the case of goods sold, it would be dangerous to carry the doctrine thus enunciated beyond the case put by that author ; and this restricted interpretation of it seems the more proper, when we recur to the authorities which he cites in support of his opinion, and upon which, we may reasonably infer, it was based. These authorities, as will be seen by the note to the passage in ques-tion, are, Hall's Emerigon on Maritime Loans, p. 94 ; and the case of the Grati-tudine, 3 R. R. 364, upon which celebrated case, great stress was laid by the plaintiff's counsel.

In Emerigon's work, *loco citato*, it is said: "It is a question whether the goods saved ought to contribute to the payment of those which have been previously sold. I believe that they must; and I derive my opinion from the rule which is established respecting goods thrown overboard to lighten the vessel, of which I have spoken in my Treatise on Assurance. For it is immaterial whether the goods be cast away or sold for the common benefit. I admit, that if the ship arrives in port, the owners are obliged to pay the value of the goods sold in the course of the voyage for the necessities of the ship, without power, excepting the case of right to institute the action of gross average. But if the vessel be lost, and part of the cargo be saved, the action of gross average is the only means of establishing an equality among the freighters, and regulating the contributions of the parties respectively."

In the case of the Gratitudine, the counsel for the petitioners, the lenders on bottomry and hypothecation of ship, freight and cargo, admitted in argument, that the cargo could not be called upon to pay what was expended in repairs of the vessel, until the proceeds of ship and freight were exhausted, and they quote the opinion of Emerigon: "Si au lieu de prende des derniers à la grosse, le capitaine avait vendu pour cause legitime, une partie des marchandises du bord, et que au retour du voyage le navire et le fret (aggravés par des engagements posterieurs et par les salaires de l'équipage) *fussent insuffisans pour rembourser le prix des dites marchandises*, cette partie devrait être supportée au sol la livre par les autres marchandises." And again: "Celui dont les effets sont vendus, pendant le voyage, pour les nécessites de la navigation, n'a pu ni s'y opposer ni se procurer aucune ressource particulière contre la personne du capitaine. Il es donc juste *qu'en cas d'insuffisance du navire et du fret* abandonnés par les proprétaires, la perte soit réglée sur l'universalité des chargeurs dont la condition doit être égale."

In his celebrated opinion in that case, Sir William Scott clearly intimates a recognition of that doctrine, for he lays stress on the fact, that the master had, at the time of hypothecation, when he compulsorily assented to the exaction of the security of the ship, freight and cargo, by the lender, reasonable ground to hope that the ship and freight, and average expenses falling particularly on the lading, would have been sufficient to discharge the bond, without calling on the cargo; and he also lays stress on the fact, that the bond having been put in suit, and the ship sold, her proceeds were insufficient to discharge the bond. The prayer of the petitioners was for a monition against the bail given to answer the action in respect to the cargo and freight, for payment of the balance due, after payment of the proceeds of the sale of the ship.

Thus it appears, at most, from these authorities, that the primary obligation to meet the loss of goods necessarily sold for the purpose of paying for repairs, rests upon the ship, and resort, by contribution, is not to be had to the owners of cargo saved, unless the ship be lost, or the proceeds of the sale be first exhausted, so that such relief is indispensable to put the owner of the goods sold on an equal footing with the other shippers. See, also, *Pope* v. *Nickerson*, 3 Story's Rep. p. 500.*

---

* In *Pope* v. *Nickerson*, Mr. Justice Story says: "That where goods are sold in a port of distress to pay for repairs, it is a loan which the maritime law allows the master to make on account of the owners, as resulting from their implied authority, and with their consent." So it was treated in the case of the Gratitudine, 3 R. R. 240; and in the case of the Packet, 3 Mason, 255. Then, it being a careful application of the funds of the shipper, without his

*(margin heading:)* HASSAM *v.* ST. LOUIS PERPETUAL INSURANCE CO.

It is obvious, that the present case does not fall within the doctrine enunciated by Mr. Kent. For here the vessel arrived at her port of destination safe, and unincumbered by subsequent engagements.

It was argued on the part of the plaintiffs, that although the general rule is, that the owner must keep the vessel in a seaworthy condition at his own charge, the present case should be considered an exception, because the repairs, which ought, say they, to be considered as only benefiting the ship to the amount of the sum paid for them at Montevideo, really cost three or four times that amount, by reason of the loss incurred in the sale of the goods to raise the money. The whole loss on the goods, they contend, should be considered as incurred for the benefit of all the interests, according to the doctrine announced by Lord Ellenborough, in *Plummer* v. *Wildman*, in which case he said : " If the return to the port was necessary to the general safety of the whole concern, it seems that the expenses unavoidably incurred by such necessity, may be considered as the subject of general average. It is not so much a question whether the first cause of the damage was owing to this or to that accident, to the violence of the elements, or the collision of another ship, as whether the effect produced was such as to incapacitate the ship, without endangering the whole concern, from further prosecuting the voyage, unless she returned to port and removed the impediment. As far as removing the incapacity is concerned, all are equally benefited by it, and, therefore, it seems reasonable, that all should contribute towards the expenses of it; but if any benefit, ultra the mere removal of this incapacity, should have accrued to the ship by the repairs done, inasmuch as that will redound to the particular benefit of the ship-owner only, it will not come under the head of general average; but that will be a matter of calculation upon the adjustment. The amount of the expenses of repairing to be placed to the account of general contribution, must be strictly confined to the necessity of the case, and the arbitrator will have to determine how much was expended upon such repairs as were absolutely necessary to the enabling the ship, with her cargo, to prosecute the voyage, and for so much, and no more, the defendant will be liable to contribute. As for the charge for the captain's expenses during the unloading, repairing and re-loading, the ship-owner must bear the captain's expenses in port, and primage must be disallowed; it does not come under general average." 3 Maule & Selwyn, 487.

The plaintiff's counsel also refer to what is said by Mr. Kent, in his chapter on general average : " If the expense of the repairs would not have been incurred but for the benefit of the cargo, and might have been deferred with safety to the ship to a less costly port, such extra expense is general average."

It may well be questioned whether the expensiveness of the repairs has any control over the question of general average. Mr. Benecke, to whom Mr. Kent himself refers for a more minute detail of the principles applicable to general average (3 Kent, 242), and whose treatise he commends for its great research, clear analysis and accurate application of principles. declares expressly that the expenses of repairing damage accidentally sustained by the vessel, must fall upon the owners, however they may exceed what the same repairs might have

---

consent, for the use and benefit of the owners of the ship, and by their authority and consent, it seems to me that the case is governed by exactly the same principles as if the money had been borrowed of a third person, and applied to the same purposes, that is, it would have bound the master personally, and the owners personally, and have also created a lien on the ship *in rem*.

cost in another port (p. 194). Moreover, although the repairs in the present case were quite expensive, by reason of the loss incurred in raising money to pay for them, it is clear they could not have been deferred, with safety to the ship, to another port. The vessel could not have completed her voyage without the repairs; nor can we say that the expense of the repairs would not have been incurred, but for the benefit of the cargo. Without the repairs, the ship was unnavigable; but in her sound condition, after repairs, her value was $7,000, which is much more than their cost. So that, in point of fact, as we infer from the evidence, it was the interest of the owners to spend what was virtually spent in repairing her, with reference merely to the ship herself.

As to the case of *Plummer* v. *Wildman*, we are unable to assent to the doctrine of Lord Ellenborough, touching the expense of repairs. It is very difficult to reconcile his remarks in that case, with what he said in the subsequent case of *Power* v. *Whitmore*, 4 Maule & Selwyn, 144. Mr. Arnould and Mr. Benecke, both disapprove the doctrine announced in the former case, and consider it as overruled by *Power* v. *Whitmore*. Benecke, 197. 2 Arnould, 908.

It was expressly adjudged in *Power* v. *Whitmore*, that the repairs of the ship, which had been compelled, for the safety of the ship and cargo, to put into a port in order to repair a damage occasioned by a tempest, were not a subject of general average.

Mr. Phillips also very distinctly intimates his dissatisfaction with the doctrine in *Plummer* v. *Wildman*, and with a case in Massachusetts (7 Pickering, 268), which was decided according to what was considered to be the ruling in that case.

After the fullest consideration which we have been able to give to this cause, and to the very interesting and important branch of commercial law which it involves, we are unable to see how, consistently with those general principles which regulate the contract of affreightment and the subject of general average, the expense of these repairs, which were rendered necessary by particular average loss, and which were indispensable for the ship's own safety, and to render her seaworthy in the further prosecution of the voyage which she had undertaken to perform, can give a claim to general average.

It appears to us, that the reasons stated by one of the adjusters, are not sufficient to exclude entirely any charge for commission for collecting and settling the general charges. It would seem reasonable, however, that they should not be as high as in ordinary cases, where the owners of ship and cargo are different, for the amount of trouble incurred is not the same. There is no evidence of the usage on the subject in a case like the present; the amount involved is small, and as the parties have not furnished the necessary evidence to enable us to close the matter, we do not think the judgment should be opened on that account, which would throw the costs on the appellees, and also involve the expense of a new trial.

It is therefore ordered, adjudged and decreed, that the judgment of the court below be affirmed; the cost of the appeal to be paid by the appellants.