[NOTE. For decisions in other actions by the same plaintiff to enforce the personal liability of the shareholders, see Cases Nos. 1,714 and 1,715.]

BOWDEN v. TURNER. See Case No. 1,716.

## Case No. 1,717.

### The BOWDITCH.

[3 Ware, 71.][1]

District Court, D. Maine, April 10, 1856.

SHIPPING — THE MASTER — LIEN FOR WAGES AND DISBURSEMENTS—SEAMEN — LIEN FOR WAGES — SALVAGE — WHO ARE SALVORS — SALVAGE BY SEAMEN.

1. The master has a lien on the freight for his wages, and necessary disbursements for the use of the ship.

2. The seamen have a lien on the freight for their wages.

[See Pitman v. Hooper, Case No. 11,185; Sheppard v. Taylor, 5 Pet. (30 U. S.) 675; The Monadnock, Case No. 9,704.]

[See note at end of case.]

3. In case of shipwreck, they have a lien on the savings of the wreck.

4. They may have a further claim against the wreck in the nature of salvage, when it is saved by their exertion.

[See Brackett v. The Hercules, Case No. 1,-762.]

In admiralty.

Butler, for libellant.

Shepley, for claimant.

WARE, District Judge. This is a libel against the owners of the schooner Bowditch, by the seamen for their wages. In November last, when the crew shipped, E. P. Talbot was master. He took the schooner on a verbal contract or agreement, to be employed in the coasting trade on shares; he, as master, to receive twenty dollars a month wages, and to be himself at the expense of victualling and manning, and, after deducting port charges, to pay over to the owners one-half of the net freight for the hire or charter of the vessel. The schooner sailed from Portland on the 23d of November, for Alexandria, with a cargo of plaster, and earned freight to the amount of $183.90, which, after deducting port charges and the master's wages, left a net freight of $123.72, one-half of which, to wit, $61.86, belonged to the owners. At Alexandria, after making some repairs, she took in a cargo of coal for New York, and on her passage to that port was wrecked and lost on Jones' beach, a beach about four miles from the shore of Long Island. The crew remained by the vessel, and faithfully labored to save as much as practicable from the wreck. The fragments saved were afterwards sold in New York for $545.75, including $16.00 for which the hulk was sold as it lay. This, after the deduction of $70.69 expenses, left the net sales of the wreck, $475.06.[2] Three-quarters of the vessel were insured by the Ocean Insurance Co. for $2,250, and the vessel being valued at $5,000 in the policy, this was three-fifths of the value of the three-quarters. The owners were duly informed of the loss and communicated the information to the underwriters, but made no abandonment, nor did the insurers claim to have or exercise any control over the savings of the wreck, or the proceeds of the sale, on the ground that there was a technical total loss. The proceeds were left in the hands of the commission merchant, by whom the wreck was sold subject to the orders of the owners.

The libellants claim wages against the owners. First, on the ground of their general liability as owners. Secondly, if this liability is denied, on the distinction that if the vessel was let to the master on such terms as constituted him owner for the voyage, on the ground that the owners have had the advantage of the freight received; and thirdly, on the ground that they have, at least, the constructive possession of the proceeds of the wreck. It is an indisputable principle of maritime law, that the seamen are entitled to be paid their wages from the freight earned. Whenever this is earned, wages are due. Freight earned and put on shore is saved from the consequences of a subsequent shipwreck. It is in part the proceeds of their own service. In this case freight was earned at Alexandria, and though not paid over to the owners, was appropriated to their use in the purchase of a boat for the vessel and other repairs. And they being bound for the repair of the vessel, it must be considered as received by them. The seamen have also a lien on the savings from the wreck, which gives them a priority over all other claims, except the expenses of salvage. The owners must be considered as having the possession of the proceeds of their savings. The master, who on such occasions is the agent of all who

---

[1] [Reported by George F. Emery, Esq.]

[2] See note at end of case.

have an interest in the ship, put the fragments saved into the hands of a commission merchant, by whose order they were sold, and the proceeds of the sale paid to him. He holds the fund and is ready to pay over the amount to any party who is entitled to receive it. Prima facie this is the owner. He has not parted with his right by an abandonment, nor have the underwriters claimed to disturb his exclusive possession on the ground that they have an interest in the proceeds. My opinion is, that the libel may well be maintained against the respondents on the ground, that they are in the possession of a fund pledged to the crew for their wages. As this is sufficient it is unnecessary to consider the other question of the personal liability of the general owners, when the vessel is let under such an agreement as this was. Skolfield v. Potter [Case No. 12,925].

The libellants also claim, against the savings of the wreck, a further reward in the nature of salvage. The right of seamen to maintain such a claim, was presented some years ago to this court in the case of The Dawn [Case No. 3,666]. And after a very full and elaborate argument, I came to the conclusion that in cases of shipwreck, seamen were bound to remain by the wreck and render their best services to rescue the property from destruction; and that if this service was faithfully performed, they were entitled to their full wages out of the remains of the wreck, to the time of the disaster; and, according to the circumstances of the case, might be entitled to an additional compensation in the nature of salvage. This, as in all other cases of salvage, would be measured by the circumstances of danger and labor which attended the service, but that it ought in all cases to be sufficient to pay their expenses home.

NOTE [from original report]. It seems to be well settled in this country, that the master has a lien on the freight for his necessary disbursements, for incidental expenses, and his liability for such expenses and also for his own wages. Note to Abb. Shipp. p. 147, and the cases there cited; 1 Ware. 149 [Drinkwater v. Spartan, Case No. 4,085]; 7 Cow. 670; 3 Mason, 255 [The Packet, Case No. 10,654]; 18 Rich. [18 Pick.] 530. Though notwithstanding the decision of Lord King in White v. Baring, 4 Esp. 22, it is otherwise settled in England. Smith v. Plummer, 1 Barn. & Ald. 575; Abb. Shipp. 147, 377, note. The reason given for refusing the master a lien on the freight is, that he has no lien on the ship for his wages and that the freight is incident to the ship. But the master is authorized to receive the freight, and if he has it in his hands he may pay himself, though he has no personal claim against the owners; for when there are cross demands it is only the balance that is due. See further, as to the English law, Abb. [Shipp.] 656, note. I have nothing to add to what is stated in the case of The Dawn [supra] as to the right of seamen to claim as salvors. In the case of The Neptune, 1 Hagg. [Adm.] 227], Lord Stowell seemed to limit their claim to that of wages. •In that case the wreck was saved by the crew; but in the case of The Reliance, Sir S. Lushington held that their claims were good for wages against

the wreck, though it was abandoned by them and saved by other parties. 2 W. Rob. [Adm.] 119.