## Case No. 4,512.

### The ERIE.

[3 Ware, 225; [1]  22 Law Rep. 152;  16 Leg. Int. 245.]

District Court, D. Massachusetts.  1859.

Mr. Parker, for libellant.
Mr. Brigham, for respondent.

WARE, District Judge.  It is contended for the libellant that this is a contract for letting the vessel, and not a contract of affreightment; and that though the loss by an accident of major force may excuse the hirer from the return of the vessel, it will not exempt him from the payment of the stipulated hire; and the case of Marquand v. Banner, 36 Eng. Law & Eq. 139, is referred to as directly in point.  That was a charter of very complicated conditions. Like this it was for a gross sum.  The vessel was to be used by the charterers as a general ship, as this might be; and the master was to sign bills of lading without reference to the charter, on such terms as the charterers might direct, as is also provided in this charter; for an action on a bill of lading, the question arose to whom the freight was due and payable,—to the ship owner or the charterer.  The court held, that as the charterers were to pay a lump sum for the use of the vessel not dependent on her earnings, that the freight accrued to the charterers, and that the master in signing the bills of lading acted as their agent, and not as the agent of the owners.  It is true that the judge, who pronounced the judgment of the court, at the close of his opinion, says that the charterers must be considered as the owners of the ship.  But taking the whole of his reasoning together, it is evident that his meaning was only that they were owners in relation to the accruing freight,

[1] [Reported by George F. Emery, Esq.]

and not owners for all purposes. A charter-party, in order to amount to a demise of the ship, and clothe the charterers with all the right and liabilities of owners. must transfer the possession of the ship as well as a right to the profits of her employment. Drink-water v. The Spartan [Case No. 4,085]. In this case the owner retained the possession by his own master and crew, and the general rule, to which there, perhaps, may be rare exceptions (Trinity House v. Clark, 4 Maule & S. 288), is, that although the owner lets the whole capacity of the ship, yet if he appoints the master and crew, it is not a demise of the ship, but a contract of affreightment Taking this to be a charter of affreightment, and not a letting of the ship, the only question raised by the libel and answer, is whether on these admitted facts anything, and if so, how much, is due under this charter. This depends upon the construction of the contract, whether the voyage out and home was a single indivisible or a divisible voyage.

It is apparent on the face of the contract, that the parties anticipated only a prosperous termination of the whole enterprise; and as such a disaster as occurred did not enter into their calculation as a probable event, it was not provided for. The court is therefore left to infer, in the best way it can, what provision would have been made, if such a disaster had been contemplated as a possibility.

There are two sources to which recourse may be had to guide our judgment in coming to a conclusion. The first is the contract itself, in all its terms and conditions. If those show to a tolerable certainty, or a reasonable probability, what their intentions may have been, if, in fact, they had any, which is, perhaps, hardly probable, then this intention ought to prevail. The second is the law which regulates and governs the subject-matter of the contract, when not affected by the special agreement of the parties. For all persons, when entering into engagements, of whatever kind, are presumed to know the law, and must be considered as making them with reference to it. The law, therefore, according to the presumed intentions of the parties, comes in as a supplement to their contracts, and measures and regulates their rights and obligations where the contract is silent.

In the first place let us look at the law. By the maritime law, when a ship is chartered for a foreign port and back, if she delivers her cargo at the outward port, the freight is earned and due. It is the price of that service which has been performed, and it is then due and payable, unless by special agreement it is made dependent on the safe arrival of the vessel at her home port, or on some other contingency. This is shown by the common form of a bill of lading. The goods are to be delivered to the consignee, he paying freight. If she is hired or chartered for several ports in succession, and proceeds on her voyage and delivers cargo at two, three, or more, and, after prosperously prosecuting her enterprise to the last outward port of delivery, is lost on her return for her home port; freight will be due, as well as wages, to the last port where 'she has delivered cargo, unless the law is controlled by the special terms of the contract, so that it is made to depend on some further condition beyond the safe delivery of the goods. There may be a partial exception in charters for a purely trading voyage along the coast, called in the French law a voyage en caravan, in which, according to Emerigon, the whole is but a single voyage; and though in this, a sort of retail trade, the freight is collected from time to time, wages are not earned, and, perhaps, charter not due until the voyage is completed. Des Assurances, liv. 13, §§ 3, 2. This, however, is but an exception, and the general rule is, that the hirer shall pay freight or charter as far as he has had the beneficial use of the vessel, notwithstanding that by an accident of major force she has been prevented from performing the whole service for which she was engaged. But parties for the purposes of freight, as between themselves, may consolidate all these voyages into one. The common law, which favors the unity and entirety of contracts, when there is but one agreement, though more than one thing is to be done under it, in a doubtful case may incline that way. But this is a maritime contract, and the maritime law easily renders contracts divisible when the justice and equity of a case require it. The charter of a vessel for a single foreign port and back, or to a number of successive ports and home, is not made one indivisible voyage because engaged for by one agreement, nor because it is called one in that agreement; but is divided for the purposes of freight, which in its largest and most general sense means the hire of the ship (1 Valin, p. 639, tit. "Du Fret."), and is also for wages divided into as many voyages as there are ports of delivery. The ship owner and charterer may, by special agreement, make them all one voyage as between themselves, and suspend the right to freight for the whole on the safe arrival of the ship at her home port. But the presumption is otherwise; and however clear this may be on the terms of the contract between the owner and charterer, it will not affect the right of third persons, who have an interest in the freight. Notwithstanding any such agreement, freight will be earned at each port of delivery for the benefit of the seamen and the holders of bottomry bonds, who have an interest in the freight. They are strangers to the contract, and their rights cannot be bargained away by the owner and charterer. I have seen, says Emerigon, in a great many (une foule) charter-parties, a provision for the forfeiture of half the freight, in case of an infraction of the contract. But, he adds, this conventional penalty cannot affect the privilege of the seamen,

nor the lenders on bottomry. The reason is, that they have given credit to the ship. She with her appurtenances, is their debtor, and the ship, by the maritime law, has earned full freight by the delivery of her cargo. The seamen and the bottomry creditors have a privilege against this freight, and have a right to proceed against it as appurtenant to the ship, on their maritime hypothecation, before it is absorbed or diminished by any private agreement between the ship owner, and the freightor. Contrats a la Grosse, c. 4, §§ 13–2, Pitman v. Hooper [Case No. 11,186]. The case stated by Emerigon does not, indeed, directly apply to this case, for this is a controversy between the owner and the charterer; and the owner, where the rights of third persons are not involved, may make the payment of freight depend on what conditions he pleases. I refer to the opinion of this eminent jurist to show how clear it is, that by the maritime law, freight is earned for the ship at every port where cargo is delivered.

It has before been observed, that no one is ever presumed to waive his own rights. Express words are required for that purpose. Still less is he to be presumed to waive the rights and interests of other parties. If his own he may relinquish for such consideration as he pleases, he can make no bargains for others without an authority for that purpose. To attempt to waive the rights of others would be an attempted fraud, and fraud is never to be imputed but on proof. Freight is the joint earning of the vessel and the crew. The holder of a bottomry bond represents the vessel, and stands in the place of the owner; for the bottomry bond includes the freight as well as the vessel. The seamen have also a right in the freight, a jus in re, which may be enforced against that in specie. These rights the owner had no authority to bargain away, especially for a consideration accruing peculiarly to himself. A construction which should hold a charter-party as to freight entire for the voyage, which should separate the freight of the outward from the homeward voyage, and make these dependent on the prosperous issue of the whole voyage, would be at once a fraud on the bottomry holder and the seamen, unless they were parties to the contract. When the question arises, therefore, in the construction of a charter-party, whether freight is due at a port of delivery, if on the whole instrument it is left doubtful, the conclusion of the maritime law would be in favor of the owner. For if it be granted that the stipulation for freight is the language of the owner, the rule that words are to be construed most strongly against the party using them, is the last rule of interpretation to be resorted to when all others fail. 6 Toull, Droit Francais, Nos. 323, 324; Dig. 44, 1–99.

We will now look at the terms of the contract. The charter describes the voyage out and home as one voyage. But this is not decisive. In fact, it is of but little significance. The same descriptive words are often, if not commonly, used where the vessel is intended for several successive ports, and it is the universal formula in seamen's contracts; but it is never construed to deprive them of wages up to the last port of delivery, whatever may be the ultimate fate of the vessel. In order to give to this language the effect of consolidating the outward and homeward voyages into one, for the purposes of freight, it must be made to appear from other conditions contained in the instrument, or from its whole tenor, that such was the intention of the parties. If the freights stipulated for in this charter-party had been a monthly freight, I should think that there would be little difficulty in allowing charter under this contract to Port-au-Prince, and for half the time the brig lay there. And the case of Brown v. Hunt, 11 Mass. 45, and Locke v. Swan, 13 Mass. 76, would amply justify the decision, if any authority would be needed. There are decisions, it is true, that have a different aspect. Byrne v. Pattinson, Abb. Shipp. 560; Coffin v. Storer, 5 Mass. 252; Blanchard v. Buckman, 3 Greenl. 1. But these, I think, stand on the better reason, and are more in harmony with the spirit and equity of the maritime law.

But the charter here stipulated for, is a single gross sum. This looks as though the parties intended a single and not a divisible contract. When the hire is fixed by a monthly sum, though the voyage is described as one, I think the presumption of the maritime law is, that for the purpose of freight, it is divisible into as many voyages as there are ports of delivery. Freight, the hire for the use of the vessel, is due as far as the charterer has had the beneficial use of it, which is to the last port where cargo is delivered. But when the owner stipulates for a single gross sum to be paid on the return of the ship to her home port, he makes the voyage apparently one. But in either case, this presumption is liable to be controlled by other conditions in the charter showing a different intention. Still this appears to be the natural inference, and I think it belongs to the party who denies it, to show that the natural conclusion is not the just one. In looking into this charter-party, we find that so much of the freight as should be required to cover the disbursements of the vessel at Port-au-Prince was payable there. So much must be considered as earned before the completion of the round voyage, and this might amount to one-half, but was not to exceed that sum. Upon this stipulation it may be fairly asked, as it was by the libellant's counsel, does it not open the contract and let in the equity of the maritime law? The whole of the outward freight is there demandable on the happening of a certain contingency. One might feel inclined to pause on this question; but it is said that this precise point has been decided by the supreme court of this state, in the late case of Towle v. Kettell, 5 Cush. 18. That was a charter-party for a voyage

from Boston to Wilmington, N. C., thence to Cape Haytien, and thence back to Boston, for a gross sum of $1500. So much was payable at Hayti as the master might require for the disbursement of his vessel, and the balance on the discharge of the cargo at Boston. The vessel made the voyage to Hayti and there delivered her cargo, and was lost on her return to Boston. The court held that it was a single indivisible voyage, and that no freight was due. The only difference between the two cases is this; in that case the balance of the freight not required to disburse the vessel was, by the terms of the charter-party, made payable on the vessel's arrival at Boston. In the present case, the time and place for the payment of the residue of the freight is not fixed by the contract, but is left to be determined by the law. The distinction, it may be said, is a narrow one. But if the cases in which the courts have been called upon to interpret charter-parties, where the performance of the entire contract has been prevented by a fortuitous event, are critically examined, it will be found that they have turned on distinctions so minute and subtle that, as is remarked in the case of Towle v. Kettell, one decision can hardly be relied on as authority for another, unless there is between them a perfect identity. The just rule of interpretation is, I think, that suggested by Lord Mansfield in the case cited from Abbott on Shipping. If there be anything in the contract from which it can be inferred that the parties contemplated a divisible and not an indivisible voyage, for the purposes of freight, it ought to be held to be divisible. This is in conformity with the general rule of law, and meets the justice of the case. This contract made the voyage divisible in a certain contingency, and to a certain extent. Beyond that, no intention is expressed. The balance of the freight is not made payable after the vessel returns to her home port, as was the fact in all the cases cited by the respondent; and it cannot, therefore, be pretended, as was urged by Lord Kenyon in the leading case of Byrne v. Pattinson, that the contingency has not happened on which the freight is payable.

The only reason upon which the defendant refuses to pay the freight on the outward voyage, is, that the whole stipulated freight out and home is in one sum. The plaintiff has performed one-half the service, and has been prevented by a fortuitous accident from performing the whole. It may be safely affirmed that it is a universal maxim of law, as it is of reason and common sense, that no one is responsible for fortuitous events without an express agreement for that purpose. Dig. 50, 17, 23; Domat, liv. 1, tit. 1, § 3, No. 9. And the general policy of the maritime law is to allow a contractor his reward as far as he has performed his service, and more especially when the other party has received the benefit of it. In this the maritime law conforms to the genius of the Roman law. If an architect agreed to build a house, and when it was partly finished it was destroyed by a fortuitous accident, "si vi naturali, veluti terrae motu acciderit," (Dig. 19, 2, 59); or if an undertaker engaged to make an artificial stream or canal, and before approval it was destroyed, "si soli vitio id accidit, locatoris erit periculum" (Dig. 19, 2, 62). In either of these cases, if the fault was in the workman "si vitio operis id accidit," the loss fell upon him, if the loss arose from unavoidable accident it fell on the owner. In such cases the workman guarantees his own work only, and the acts of Providence are left to be borne by those on whom they fall. On the authority of these cases, Domat so states the law (livre 1, tit. 4, § 3, Nos. 8, 2, 10), though the price is fixed at one sum, "un certain prix de l'ouvrage entier." And Voet (livre 19, 2, 37), without any misgiving thus explains the law.

It is true that the common law, in its original features, as they are disclosed in the early reports, inclines strongly against the apportionment of contracts. It is equally true that the elements of the common law were formed and grew to maturity under the Norman aristocracy, when the people had no voice in making it. The rules of law were generally favorable to capital and wealth, and bore hard on poverty and labor, as is always the case when the law is made by an aristocracy. But it is abundantly proved by the late reports, that the humanity of modern judges has struggled hard against the severity of the ancient rule, and has often made exceptions on slight grounds. The leading case in favor of the old law is Cutter v. Powell, 6 Term R. 320, decided under the presidency of Lord Kenyon, who, although not much distinguished as a classical scholar was delighted to stand, in his own language "super antiquas vias" of the law. The old doctrine has been met by the solid reasoning of Chief Justice Parker, in Britton v. Turner, 6 N. H. 481. The cases are faithfully collected in 1 Pars. Cont. bk. 3, c. 9, § 1, particularly note p and 2 Pars. Cont. pt. 2, § 5. The author himself gives a strong intimation of his opinion in favor of the later doctrine. The broad basis on which the decisions turn is that of apportionment. The distinction on which the decisions often rest, is whether the price agreed is one gross sum, or whether it is made up by a computation of days, weeks, or months. But this can make no difference in principle, but is only important in ascertaining the common intention of the parties. On the whole, as well on the general principles of the maritime law, as on the peculiar phraseology of this contract, my opinion in this case is that the contractor did not become an insurer against inevitable accident, which alone prevented him from the completion of his contract, and is entitled to his outward freight.

The decree will be for $896, with interest, deducting $4 paid and costs.