## UNITED STATES v. ROBINS DRY DOCK & REPAIR CO. et al., and three other cases.

## THE NEPONSET CASES.

(Circuit Court of Appeals, First Circuit. June 8, 1926.)

### Nos. 1983–1986.

**1. Shipping ⬥⟶24—Sale contract held to have superseded charter agreement, where charterer operated vessel thereunder and paid initial installmnt, though not signing contract.**

Where, after operating a vessel owned by the Shipping Board under a charter containing an option to purchase, a sale contract was prepared and signed by the Shipping Board, and the charterer, while not signing it because of objection to one of its provisions, afterward modified, paid the initial installment of the purchase price and continued to operate the vessel, such operation was under the new contract, the terms of which superseded those of the charter agreement.

**2. Maritime liens ⬥⟶30.**

Under Ship Mortgage Act June 5, 1920, § 30, subsec. R. (Comp. St. Ann. Supp. 1923, § 8146¼pp), a furnisher of supplies to a vessel is bound to inquire as to the authority of the person ordering to bind the vessel, and is chargeable, with knowledge of whatever such inquiry, made with reasonable diligence, would have disclosed.

**3. Maritime liens ⬥⟶30—Furnishers of supplies to vessel of Shipping Board, operated by purchaser under conditional sales contract, are charged with notice of want of authority of purchaser to impose lien, shown by ship's papers.**

Under a provision of a contract for conditional sale of a ship by the Shipping Board, requiring the buyer "to carry a properly certified copy of this agreement with the ship's papers, and take such other appropriate steps * * * as will give notice to the world that the buyer has no right, power, nor authority to suffer or permit to be imposed on or against the vessel any liens which might be deemed superior to, or a charge against, the interest of the seller," furnishers of supplies on order of the buyer are charged with notice of its want of authority to bind the ship, which they could have learned in the exercise of reasonable diligence by examination of the ship's papers.

**4. Maritime liens ⬥⟶28.**

Charter provision or contract of sale of a ship, that charterer or purchaser "will not suffer nor permit to be continued any lien," should be read as meaning that he will not suffer any lien, nor permit one to be continued should it arise under the law, as for wages, or in case of salvage or collision.

**5. Shipping ⬥⟶154.**

Freight is incident to the ship, and there can be no maritime lien on freights, if there is none on the ship.

**6. Shipping ⬥⟶149.**

On retaking a ship from a purchaser by the United States, before delivery of her cargo, for breach of the contract, the right of the purchaser to the freights terminated, and vested in the United States.

Appeals from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

Suit in admiralty by the United States against certain freight money due the steamship Neponset, with intervening libels by the Robins Dry Dock & Repair Company and others, by the Standard Oil Company (New Jersey), by the McCormack Stevedoring Company, Inc., and by the Robins Dry Dock & Repair Company, claiming liens, who also filed independent suits against the United States. From the decrees in favor of the lien claimants, the United States appeals. Reversed and remanded, with directions.

For opinions below, see 300 F. 981, 4 F. (2d) 132.

Arthur M. Boal, of Washington, D. C., and George R. Farnum, Asst. U. S. Atty., of Boston, Mass. (Harold P. Williams, U. S. Atty., of Boston, Mass., on the brief), for the United States.

Henry Parkman, Jr., of Boston, Mass. (Putnam, Bell, Dutch & Santry, of Boston, Mass., and Haight, Smith, Griffin & Deming, of New York City, on the brief), for Robins Dry Dock & Repair Co.

Charles R. Hickox, of New York City (Frank A. Bernero, of New York City, and Charles S. Bolster, of Boston, Mass., on the brief), for Standard Oil Co. and McCormack Stevedoring Co.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. These cases come before us upon four appeals from final decrees of the District Court for the District of Massachusetts.

In No. 1983, the United States proceeded by libel against certain freight moneys due the steamship Neponset. Pursuant to the libel, the freight moneys were paid into court. Then followed certain intervening libels of parties claiming maritime liens superior to the claim of the United States.

In No. 1984, the Standard Oil Company, in this independent libel, as well as in its intervening petition, claims to have furnished fuel oil to the Neponset at San Pedro, Cal., and in the Canal Zone on May 31, 1922, and it appears that the orders for this fuel oil were given in New York by an official of the Elder Steel Steamship Company, Inc., to an official of the Standard Oil Company.

In No. 1985, the McCormack Stevedoring Company, in this independent libel and in its

intervening petition, claims to have rendered services to the Neponset at the port of New York, in connection with the cargo discharged at that port in the early part of June, 1922, just before the vessel proceeded to Boston, where she was seized on or about June 19, 1922. The orders in this case were given by an official of the Elder Company to an official of the McCormack Stevedoring Company.

In No. 1986, the Robins Dry Dock & Repair Company, in this independent libel and in its intervening petition, claims to have made certain repairs to the Neponset in the port of New York in March, 1922, on the order of an officer of the Elder Steel Steamship Company.

It does not appear that in any of the above cases there was any order given by the master or any officer of the vessel. The District Court held the three libelants and interveners, the Standard Oil Company, the McCormack Stevedoring Company, Inc., and the Robins Dry Dock & Repair Company, to be entitled to maritime liens on the freight moneys; that these liens were superior to the claim of the United States; and it entered decrees in their favor for the full amount claimed against the freight moneys. From these decrees, appeals are taken to this court.

The case shows that, at all times involved in these proceedings, the steamship Neponset was owned by the United States, as represented by the Shipping Board; that on April 10, 1920, the Shipping Board entered into an agreement with the Elder Steel Steamship Company, Inc., the agreement being known as the "charter agreement," by which it chartered the ship to the Elder Steel Steamship Company, Inc. In pursuance of that agreement the Neponset was delivered to the Elder Steel Steamship Company, Inc., on May 13, 1920. The charter agreement contains these provisions:

"(1) The owner agrees to let, and the charterer agrees to hire, said vessel from the time of delivery for the period of 18 months. * * *

"(2) The charterer shall, at its sole expense, man, operate, victual and supply said vessel. * * *

"The charterer will not suffer nor permit to be continued any lien, incumbrance, or charge which has or might have priority over the title and interest of the owner in said vessel. * * *

"In general, the charterer shall operate the said vessel free of any expense to the owner of any nature or kind whatsoever.

"(4) The charterer shall pay to the owner upon delivery of the vessel the sum of $48,062.16, for the option to purchase hereinafter contained, and in addition thereto shall pay to the owner for the use of said vessel $48,625 ($5 per cwt) per calendar month in advance commencing on and from the day of her delivery as aforesaid, and at and after the same rate for any part of a month; hire to continue until her delivery in like good order and condition to the owner (unless lost or unless charterer exercises option to purchase) at a United States Atlantic port, north of Hatteras. * * *

"The owner shall have a lien upon all cargoes, and all subfreights, for any amounts due under this charter party."

By section 10, the Elder Company had an option to purchase the vessel for $1,922,486.62, and payments of charter hire were to apply as payments on account of the purchase price.

Subsequently to the execution of the charter agreement, negotiations were entered into looking to an outright agreement of purchase. That agreement—which may be called the sales agreement—dated November 24, 1920, was drawn up and executed by the Shipping Board and forwarded to the Elder Company. The company refused to execute the agreement, because it objected to certain sinking fund provisions, and for this reason only. The November agreement—the sales agreement—fixed the purchase price at $1,907,364.25, provided that the buyer (Elder Steel Steamship Company, Inc.) should pay 10 per cent. in cash, $190,736.42, and the rest in stated installments, and provided, also, when the buyer should have paid 50 per cent. of the purchase price, that the seller (the United States) should execute and deliver to the buyer a bill of sale of the vessel, and that the buyer would immediately execute a mortgage (substantially in the form of the mortgage attached to the agreement) to secure the unpaid purchase price. It then provided in section 5 as follows:

"From the time of the delivery of the vessel by the seller to the buyer, and until title to the vessel shall have been transferred to the buyer in accordance with the provisions of paragraph 6 hereof, the buyer agrees [among other things to the following]:

"'(d) The buyer shall not suffer to be continued any lien or charge having priority to or preference over the title of the seller in the vessel, or any part thereof.

"(g) To carry a properly certified copy of this agreement with the ship's papers, and to take such other appropriate steps designated to it by the seller from time to time as

will give notice to the world that the buyer has no right, power, nor authority to suffer or permit to be imposed on or against the vessel any liens or claims which might be deemed superior to or a charge against the interests of the seller in the vessel.'"

The form of mortgage attached to the sales agreement contained the following covenant in section 3:

"Not to suffer nor permit to be continued any lien, incumbrance, or charge which has, or might have, priority over this mortgage of the vessel to the party of the second part."

The agreement of sale also provided in section 3 as follows:

"Upon execution of this agreement, the said charter sales agreement hereinbefore referred to shall be superseded by this agreement."

The charterer, the Elder Company, continued to operate the Neponset until she was seized by the United States marshal on June 19, 1922, at the port of Boston, pursuant to the possessory libel by the United States.

The District Court held that the provisions of the charter sales agreement, namely, the April agreement, prohibited the Elder Steel Steamship Company from imposing maritime liens on the Neponset, but that this agreement had been abandoned. The court based its ruling upon United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, in which case the Supreme Court construed the identical provision contained in the April agreement, namely:

"The charterer will not suffer nor permit to be continued any lien, incumbrance, or charge which has or might have priority over the title and interest of the owner in said vessel."

[1] After the lapse of the 18 months which the charter agreement had to run, and after the sales agreement of November, 1920, had been sent to the Elder Company, that company paid the initial 10 per cent. payment, but still objected to the provision in the agreement that the freight earned by the steamer should be set aside as a sinking fund, and, at its request, the requirement for the sinking fund was extended. The Elder Company did not execute the agreement, but continued in possession and in operation of the ship until she was seized by the United States marshal on June 19, 1922, at the port of Boston, pursuant to a possessory libel filed by the United States. The Elder Company never paid the second installment on the purchase price.

We think the District Court was right in holding that the charter party under which the Neponset was first operated had been abandoned, and that, while the new sales agreement was never executed by the Elder Steel Steamship Company, the Neponset was being operated under an arrangement in substantial accordance therewith.

The District Court ruled that the decision in United States v. Carver requires all furnishers of repairs or supplies always to make inquiry, whether or not they know facts which would lead them to think that the vessel was not owned by the company operating it. The court was clearly right in this ruling. It ruled also that, under the Carver Case, the charterer need go no farther in his investigations, if he finds that the person ordering the repairs or supplies is the owner, or his agent, unless he has reasonable grounds to suppose that the owner was in possession, under an agreement for purchase, which forbade the imposition of liens, and that in the latter case he must use reasonable diligence to discover the terms of the agreement of purchase. The District Court proceeds:

"The doctrine of the Carver Case should not be extended. Even if there are circumstances which put the furnisher on inquiry, he should not be obliged to conduct an investigation into facts often complicated, sometimes requiring judicial determination for their final interpretation, and to decide at his peril whether a lien was possible or not.

"Upon the facts in this case I find that the Standard Oil Company, the Robins Dry Dock Company, and the McCormack Stevedoring Company are entitled to liens. * * * If I am in error as to the scope of the decision in United States v. Carver, and there was a duty imposed on the libelants to find out the terms of the agreement for purchase, I rule that the agreement for purchase in this case gave the vendee in possession a right to impose a lien for repairs or supplies. * * * The provisions of paragraph 5 (d) show that liens were within the contemplation of the parties, and clause (g) does not add any further restriction, but merely provides for notice. The proper construction of clause 5 (d) and clause 5 (g) is in my opinion not that the Elder Company had no power to allow a lien to be imposed, but that its neglect to pay it within 15 days after it became due would be a breach of the agreement."

We are unable to agree with the learned judge of the District Court in his construction of the sales agreement or in his conclusions.

[2] The record shows that the Standard Oil Company had been informed that the Shipping Board had sold the Neponset on a plan for partial payments, and that it had received

a report from the American Audit Company showing that the Elder Company owed the Shipping Board $1,750,000 on the Neponset. We must conclude that the Standard Oil Company had knowledge that the Elder Company had bought the Neponset from the Shipping Board under an installment contract, and that it was an agreed purchaser in possession. It does not appear that, having this knowledge, the Standard Oil Company made any inquiry to ascertain the terms of the agreement under which the Elder Company had obtained the vessel, or as to the arrangement under which the Elder Company was operating the ship. It does not appear that any inquiry of any kind was made by either the McCormack Stevedoring Company or the Robins Dry Dock & Repair Company. We cannot agree with the District Court that these lienors exercised the reasonable diligence required by the law to ascertain the authority of the person in possession to bind the ship.

In United States v. Carver, 260 U. S. 482, 488, 43 S. Ct. 181, 182, 67 L. Ed. 361, in speaking for the Supreme Court, Mr. Justice Holmes said:

"The act of 1910, * * * after enlarging the right to a maritime lien and providing who shall be presumed to have authority for the owner to procure supplies for the vessel, qualifies the whole in section 3 as follows: 'But nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.' We regard these words as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms. * * *

[3] But it is said that the charter party, if known, would have shown that the master at least, if not the agent who ordered the supplies, had authority to impose a lien, since the charter party contemplated the possibility of one being created and provided for its removal. The South Coast, 251 U. S. 519 [40 S. Ct. 233, 64 L. Ed. 386], is cited as establishing

the position. But there is a sufficient difference in the language employed there and here to bring about a different result. In the South Coast the contract went no farther than to agree to discharge liens within a month. Here the primary undertaking was that 'the charterers will not suffer nor permit to be continued any lien,' etc. We read this as meaning will not suffer any lien, nor permit the same to be continued. Naturally there are provisions for the removal of the lien if, in spite of the primary undertaking, one is imposed or claimed. But the primary undertaking is that a lien shall not be imposed."

In P. H. Gill & Sons Forge & Machine Works v. United States, 1 F.(2d) 964, 965, the Circuit Court of Appeals for the Fourth Circuit followed the Carver Case, and said:

"The statutory requirement of reasonable diligence on the part of a furnisher of a vessel to ascertain the authority of a person in possession to bind the vessel is not necessarily met by reliance on the mere statement of the person in possession that he is the owner. If such a statement were held always to take the place of inquiry from accessible sources, the statute would afford no protection to persons having the right to contract that their vessels should be kept free from liens."

In Frey & Sons v. United States, 1 F.(2d) 963, 964, the Circuit Court of Appeals for the Fourth Circuit had before it a contract of sale substantially identical with the agreements in the case at bar. It held that the agreed purchaser in possession was without authority to pledge the credit of the vessel and denied the supply man a lien for that reason. The court said:

"The argument is that this provision brings the case under the reasoning and decision in The South Coast Case, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, and not under United States v. Carver, 260 U. S. 482, 489, 43 S. Ct. 181, 67 L. Ed. 361. There may be doubt whether this provision of the contract, standing alone, forbade the creation of any lien on the vessel by the conditional purchaser; but we think all doubt is dispelled by another provision of the contract for the sale of the vessel:

" 'The buyer agrees to carry a properly certified copy of this agreement with the ship's papers, and to take such other appropriate steps designated to it by the seller from time to time as required by circumstances as will give notice to the world that the buyer has no right, power, nor authority to suffer or permit to be imposed on or against the vessel any liens or claims which might be deemed

superior to or a charge against the interest of the seller in the vessel.'

"The contract of sale forbade the creation of a lien on the vessel by the conditional purchaser. The libelant knew that there was a conditional contract of sale, and that the purchase money had not been paid, and it was charged with inquiry as to its terms."

Then follows a citation of the Carver Case and other cases.

In Cordova v. Hood, 17 Wall. 1, 8 (21 L. Ed. 587), the Supreme Court said:

"Wherever inquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge, with the duty of using them, are, in equity, equivalent to knowledge itself."

If the lienors in the instant case had examined the contracts, and looked into the relations and arrangements existing between the Elder Company and the Shipping Board, they would have found that the Neponset had been delivered to the Elder Company in May, 1920, under a charter agreement to last 18 months, and containing a clause forbidding liens, and providing that the charterer shall operate the ship free of expense to the owner. It would have found also that the sales agreement of November, 1920, under the terms of which the Elder Company was then acting, provided:

"From the time of delivery of the vessel by the seller to the buyer, and until title to the vessel shall have been transferred to the buyer in accordance with the provisions of paragraph 6 hereof, the buyer agrees:

"(d) The buyer shall not suffer to be continued any lien or charge having priority to or preference over the title of the seller in the vessel or any part thereof. * * *"

And:

"(g) To carry a properly certified copy of this agreement with the ship's papers and to take such other appropriate steps designated to it by the seller from time to time as will give notice to the world that the buyer has no right, power, nor authority to suffer or permit to be imposed on or against the vessel any liens or claims which might be deemed superior to or a charge against the interest of the seller in the vessel."

It would have been found also that only 10 per cent. of the purchase price had ever been paid, and the title had never passed from the United States to the Elder Company.

[4] In construing the above provisions of the sales agreement we think the District Court did not give force enough to clause (g).

It is clear that liens were within the contemplation of the parties. There are many liens which may be imposed by the operation of law, in spite of any prohibition inserted in the charter or in the sales agreement. Among such liens are those for salvage services, for collision, for seamen's wages. It seems clear to us that clause (g) in the sales agreement was intended to provide for giving notice of an existing provision in that agreement, that the primary undertaking in this case was the same that Mr. Justice Holmes found in the Carver Case, namely, that "the charterers will not suffer nor permit to be continued any lien," etc., and that we should read this in the same way that the Supreme Court read it, in that case, viz. as meaning "that the charterers will not suffer any lien, nor permit the same to be continued." Clearly the parties indicated their understanding of the contract that the buyer had no authority to impose liens upon the ship and that it was their duty to give notice of that fact.

We are of the opinion that the sales agreement denied to the Elder Company the power to impose liens on ship or on freight moneys for supplies, stevedoring services, or repairs. The proofs show, we think, that under the rule of reasonable diligence laid down in United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, supra, none of the lienors in the instant case used such diligence. If the lienors had attempted to obtain accurate information, they could have readily found it from reliable sources by examining the ship's papers, or by inquiring of the Shipping Board, or of the Elder Company, to see the contracts under which the ship had been acquired and under which it was being operated. We think they were charged with knowledge of the terms of these agreements and that they did not acquire maritime liens upon the ship.

The rule laid down by the Supreme Court in the Carver Case may perhaps impose a greater burden upon the lienors than any case brought to our attention; but we feel compelled to follow the rule, as it has been followed in the cases we have cited.

[5] It is urged by the learned proctor for the Standard Oil Company and the McCormack Stevedoring Company, Inc., that these lienors are entitled to maritime liens against the freights for all the supplies and labor furnished by them; that freights are entirely distinct from the ship herself; that, even though the court shall find that the lienors did not use reasonable diligence in ascertaining the terms under which the Elder Company was in possession of the Neponset, and even

though the lienors should be held to be charged with knowledge of the terms of the agreement of the parties and of the relations existing between the Elder Company and the Shipping Board, and prohibited from acquiring liens on the ship, these lienors may still enforce their liens upon the freight, inasmuch as freights are entirely distinct from the ship. They insist that, under general maritime law, the furnishers of supplies and labor are entitled to a maritime lien against the freights which the supplies and labor helped to earn. They refer to cases in which Judge Addison Brown has held that the freight is liable for all charges incurred in earning it, and that, where the proceeds of the ship are insufficient to pay such charges, they are entitled to come against the freight money. The Velox (D. C.) 21 F. 479; The Olga (D. C.) 32 F. 329; Freights of the Kate (D. C.) 63 F. 707. They insist that the admiralty rules of the Supreme Court recognize that ship and freight are entirely distinct; that rule 13 allows a material-man to sue for supplies, repairs, or other necessaries "in rem against the ship and freight or in personam against any party liable." They cite The Charles C. Lister (D. C.) 161 F. 585, 586, in which case Judge Adams held that freight is not part of the vessel, as her tackle is; that the rules of the Supreme Court have the force of law. They refer to numerous other cases to the effect, as they urge, that a lien may exist on freights apart from any lien on the ship. The Larch (C. C. 1st) Fed. Cas. No. 8,085; Ex parte Clark (D. C. Mass. 1843) 5 Fed. Cas. 832; Ingersoll v. Von Bokkelin (1827) 7 Cow. (N. Y.) 671; The Packet, Fed. Case No. 10,654; Drinkwater v. The Spartan, Id. 4,085; The J. F. Spencer, 5 Ben. 151, Fed. Cas. No. 7,316; The Charles H. Cramp (D. C.) 3 F.(2d) 311; and other cases to the same effect.

[6] The record shows that the freight moneys were not fully earned until after the seizure of the ship by the United States in the possessory proceedings in June, 1923. The cargo was discharged from June 19 to June 30, 1922. In discharging the cargo and in earning the freight, the government expended $12,947.63, and this expenditure was necessary to enable the vessel to deliver her cargo and earn freight money.

We think the learned judge of the District Court was right in finding that the United States followed the agreement in withdrawing the ship from the Elder Company for its failure to pay the second installment of the purchase money, and that, under the terms of the agreement, the rights of the company ceased as soon as the libel for possession was filed, and that the freight was not earned until after that time. We agree with Judge Lowell in holding that the "freight is regarded as belonging to the vessel, and the lien attaches to it as if it were a part of the ship, like the tackle." Thirteenth admiralty rule, 254 U. S., Appendix.

The American rule as to freights is derived from the English rule—that the freight follows the ship.

In Case v. Davidson, 5 M. & Sel. 79, 82, Lord Ellenborough said:

"Although this question now comes distinctly in judgment before us for the first time, yet it has, I own, been long considered, in my mind, as settled, that freight follows as an incident the property in the ship, and therefore, as between the respective underwriters on ship and freight, an abandonment of the ship carries the freight along with it."

And this case has been followed by a long line of decisions in the British court. In The Castlegate, Appeal Cases, 38, it was held that there could be no maritime lien on the freights if there was none on the ship. This rule appears to have been adopted by the Circuit Court of Appeals for the Second Circuit in Merchants' Bank v. Cargo of the Afton, 134 F. 727, 728, 67 C. C. A. 618. See In re A. G. & P. Steamship Co. (D. C.) 289 F. 145; Brown v. Tanner, Law Reports, 3 Chancery Appeal Cases, 597; Pelayo v. Fox, 9 Pa. 489; In re Atlantic Gulf & Pac. S. S. Co.; In re Orr & Son (D. C.) 3 F.(2d) 309; Carver on Carriage by Sea (7th Ed.) 592.

In The Erie, 3 Ware, 225, 229, Fed. Cas. 4512, Judge Ware defined freight as meaning "in its largest and most general sense the hire of the ship." 1 Valin, 329. In The Bowditch, 3 Ware, 71, 74, Fed. Cas. 1,717, Judge Ware said:

"The reason given for refusing the master a lien on the freight is that he has no lien on the ship for his wages and that the freight is incident to the ship. But the master is authorized to receive the freight, and if he has it in his hands he may pay himself." See, also, Drinkwater v. Spartan, 1 Ware, 145, Fed. Cas. No. 4,085.

It will be seen that Judge Ware based his definition upon the theory that a maritime lien on freights and the remedy in rem for freight money depend upon the like remedy being available against the ship. Carver on Carriage of Goods by Sea, § 601. Clearly he adopted the English view that freight is incident to the ship, and that title to the ship carries title to the accruing freight. If there

was no lien on the ship, there can be no lien on the freight.

We find nothing to the contrary of this view in the cases brought before us by the learned counsel for the libelants. We do not find in any of those cases that a lien was held to exist on freights in cases where no lien could exist on the ship. In The Velox (D. C.) 21 F. 479, the claims for liens involve the Code of the Netherlands, and not a question arising under American or English law. In the case of The Charles C. Lister (D. C.) 161 F. 585, the decision was based upon rules of the Supreme Court, providing that the supplyman might proceed against the ship and freight in rem, and that mariners in wage cases might proceed against the ship and freight in rem. While it is true that in a general sense the rules of the Supreme Court may be said to have the force of law, in Washington Southern Co. v. Baltimore, 263 U. S. 629, 635, 44 S. Ct. 220, 222 (68 L. Ed. 480) in speaking for the court, Mr. Justice Brandeis said:

"The function of rules is to regulate the practice of the court and to facilitate the transaction of its business. This function embraces, among other things, the regulation of the forms, operation and effect of process, and the prescribing of forms, modes and times for proceedings. Most rules are merely a formulation of the previous practice of the courts. Occasionally, a rule is employed to express, in convenient form, as applicable to certain classes of cases, a principle of substantive law which has been established by statute or decisions. But no rule of court can enlarge or restrict jurisdiction. Nor can a rule abrogate or modify the substantive law."

We are of the opinion that under the sales agreement the Elder Steel Steamship Company had authority to collect freights when they were fully earned and became due, and this authority was terminated on the seizure of the ship. We have already found that it had no power to impose liens on the ship, and we find further that it had no power to impose liens on the freights; for freight is the hire of the ship and incident to the ship. It had no authority to deal in any way with the freights of the Neponset earned after her seizure.

Our conclusion is that the District Court erred in holding that the interveners and libelants had liens on either the Neponset or her freight moneys.

The decrees of the District Court in the independent libel proceedings, No. 1984,

Standard Oil Company v. United States, 1985, McCormack Stevedoring Company v. United States, and in 1986, Robins Dry Dock & Repair Company v. United States, are reversed. In No. 1983, the decree in favor of the interveners, the Standard Oil Company, the McCormack Stevedoring Company, and the Robins Dry Dock & Repair Company, is reversed. The cases are remanded to the District Court, with instructions that the libels in Nos. 1984, 1985, and 1986 be dismissed, with costs to the United States; that the petitions for intervention of the Standard Oil Company, the McCormack Stevedoring Company, and the Robins Dry Dock & Repair Company, in No. 1983, be dismissed, with costs to the United States; and that the freight moneys now in the registry of the court be awarded to the United States. No party recovers costs in this court.