### THE U. S. 219.
### No. 11.

District Court, E. D. Pennsylvania.

Nov. 30, 1937.

Howard M. Long, of Philadelphia, Pa., for libelant.

Conlen LaBrum & Beechwood and James S. Benn, Jr., all of Philadelphia, Pa., for respondents.

MARIS, District Judge.

This is a possessory suit in admiralty by which the libelant, Chesapeake Oil Transport Company, hereinafter called Chesapeake, seeks to secure the return to it by the respondents of oil barge U. S. 219, hereinafter called the barge. Respondent Steel Oil Transport Corporation, hereinafter called Steel, has filed a cross-libel against Chesapeake seeking damages for its loss of use of the barge during the time it has remained in the custody of the marshal since the institution of the suit. From the evidence I make the following

Special Findings of Fact.

On and prior to April 18, 1936, Steel was the owner of the barge and on that day it entered into a written bare boat demise charter party agreement with Chesapeake in the following form:

"Chesapeake Oil Transport Company,
    "Attention of Geo. E. Rogers, Pres.
"Foot of Dock Street,
"Baltimore, Md.
"Gentlemen:

"It is hereby mutually agreed that:

"Oil Barge 'U. S. 219' is delivered to your account for the sum of $400.00 (Four hundred dollars). The second payment of $400.00 is due to be paid on May 25th, 1936 and every month thereafter on the 25th day of that month for as long as you wish to charter barge. Should charterer decide to terminate the charter and not purchase the barge, the barge is to be returned to Philadelphia at the expense of the charterer.

"Charterer is to insure at their expense the barge 'U. S. 219' for all Marine risks and explosion in a responsible and acceptable insurance company to the owners, for a valuation of $8,000.00 (Eight thousand dollars) Charter is also to carry at their expense all insurance necessary on cargoes, crew, longshoremen etc.

"If the sale price of $8,000 is agreed upon at any time by the charterer, then the owners agree to apply all charter money toward purchase price and the charterer further agrees to pay the owners at the rate of $500.00 per month on the balance due until the full purchase price of $8,000.-00 has been made.

"Charterer agrees that barge is in seaworthy condition upon the time of delivery to their account and agrees to return barge in the same condition, ordinary wear and tear excepted.

"Accepted by Charterer
    "Chesapeake Oil Transport Company
    "[Signed] By:  G. E. Rogers,
                        "President
"Accepted by Owners
    "Steel Oil Transport Corp.
    "[Signed] By:  John M. Wheaton,
"April 18, 1936.
"Philadelphia, Penna.
"Witness:
"[Signed]  John H. Fisher."

The barge was of steel plate construction. It was approximately twenty years old and had originally been used for carrying dry cargo, but after having been laid up for a considerable period it had been converted, at a minimum of expense, into a tank barge suitable for carrying oil. At that time it had been repaired by adding doubling plates along the light water line outside the cargo compartments. At the bow and stern, however, doubling plates had not been added and the original plates on the light water line were much worn and thin. Before signing the charter party George E. Rogers, president of Chesapeake, inspected the barge while she was lying light at a dock in Philadelphia. He examined the deck and hull above the light water line but did not go down into the fore and after peaks, nor was it possible for him to examine the hull below the water line.

Following the execution of the charter party the barge was taken possession of by Chesapeake at Philadelphia and towed to Baltimore after which it was put into service carrying heavy road oils from Norfolk to various other points in Virginia. Upon

its arrival at Baltimore a hole was discovered in the hull on the starboard side of the forepeak. This was repaired by Chesapeake. Afterward at various times in the course of its service the barge sprang leaks in both the forepeak and the afterpeak or lazarette, which were repaired by Chesapeake from time to time.

On September 12, 1936, while the barge was en route from Kinsale to Norfolk she developed serious leaks in her forepeak and upon arrival at the latter port it was found impossible to load her without repairs. William W. Cherry, chief engineer of Chesapeake's tug Frances of which the barge was in tow, who had been placed by Chesapeake in charge of the barge, thereupon telephoned Rogers and suggested obtaining three bids for the necessary repairs. Rogers in turn telephoned to John H. Fisher, secretary of Steel, who approved the procedure. Cherry thereupon took three bids, accepted that of Colonna's Shipyard, Inc., hereinafter called Colonna's, which was the lowest, took the barge to the shipyard, and directed Colonna's to proceed with the repairs.

When the barge was taken out on the railway it was found that the plates at the light water line at both bow and stern were worn very thin and in many places had holes through them. The repairs made by Colonna's consisted of placing doubling plates at the light water line at the bow and stern where the original plates were thin and of repairing the steering gear and rudder. The doubling plates were necessary in order to reinforce the deteriorated plates at these points. The condition of the latter was solely the result of ordinary wear and tear. The repairs, however, were necessary to render the barge seaworthy.

While these repairs were being made Louis D. Steel, treasurer of Steel, and Fisher, its secretary, visited the shipyard, inspected the barge on the railway and ordered additional work to be done, consisting of cleaning and painting the barge. This order was given by them to Colonna's through Cherry. At this visit neither of them protested against the other work which was being done by Colonna's pursuant to Cherry's order nor did they indicate to Colonna's that Steel would not be responsible for it.

The repairs were completed by Colonna's in a good and workmanlike manner and the charge made for the work, other than the cleaning and painting, was $877.-50, which was a fair and reasonable charge. Shortly after the work was completed a bill for this amount was sent by Colonna's to Steel and was entered by Steel as a liability on its ledger, but has not been paid either by Steel or Chesapeake. The charge of $160 made for cleaning and painting the barge was paid by Steel on January 18, 1937. Colonna's claimed a lien against the barge for the other repair charges and brought suit in rem against the barge in this court to collect the same on February 16, 1937. Colonna's Shipyard v. Oil Barge U. S. 219, 21 F.Supp. 463.

Charter hire at the rate of $400 per month was paid by Chesapeake to Steel for a period of eight months, or up to December 25, 1936. The first monthly installment was paid in advance but thereafter payments were not made in advance and in many cases not until more than one month after they were due. Steel acquiesced in these delays in payment of charter hire, in some cases actually requesting the issuance by Chesapeake of postdated checks, and made no attempt to rescind the charter party until December 15, 1936. On that day John M. Wheaton, president of Steel, informed Rogers, president of Chesapeake, that he wanted the barge unloaded and returned to Philadelphia because of the failure to pay charter hire promptly, to maintain insurance, and to pay for the repairs made by Colonna's.

By a letter dated the same day but mailed on December 16th Chesapeake notified Steel that it was exercising the option contained in the charter party to purchase the barge. With this letter it forwarded a postdated check for the monthly charter hire of $400 for the period from November 25th, to December 25th, which check was accepted and subsequently collected by Steel.

On December 19th Steel wrote Chesapeake informing it that its proposed exercise of the option to purchase was not in accordance with the terms of the charter party and was not acceptable. It further stated therein that Chesapeake was then and had continuously been in default in payment of its charter hire, had failed to keep the barge insured, had incurred charges against the barge for repairs while in its possession which it had not paid, and that the charter was canceled and return of the barge was demanded. Chesapeake, however, did not return the barge to Steel as demanded.

On January 2, 1937, the barge was tied up at the wharf of Chesapeake in Baltimore, having steam pumped by the tug Frances into the coils in its cargo holds preparatory to unloading the remainder of its cargo of oil. In the late afternoon of that day Wheaton and Fisher, officers of Steel, appeared at Chesapeake's wharf with a tug and after a scuffle with Rogers forcibly took possession of the barge from Chesapeake and towed it to Philadelphia. At the time the barge contained about 20,000 gallons of oil, having a value of six cents per gallon and in addition had on board certain equipment belonging to Chesapeake consisting of a pump with electric motor attached, about 1,000 feet of 3-inch iron pipe, a lot of tools, and some miscellaneous equipment.

Chesapeake maintained insurance upon the barge as required by the terms of the charter party from the time it took possession of her, until noon on January 2, 1937. After noon on that day and until she was taken possession of by Steel marine risks with respect to her were covered by a valid binder, which was subsequently canceled.

### Discussion.

■ This is a possessory suit in admiralty in which the right to possession of the barge as between the parties to a charter party is sought to be determined. This court, therefore, has jurisdiction. The Nellie T (C.C.A.) 235 F. 117.

The controversy arises out of the charter party agreement of April 18, 1936. That instrument was rather inartificially and informally drawn. It is clear, however, that it is a bare boat demise charter to continue for as long as the charterer desires the use of the barge and to terminate at any time at its sole option. The charter hire is $400 per month payable on the 25th day of each month in advance. There is the customary provision for maintenance of insurance by the charterer and there is included an option to the charterer to purchase the barge at any time for the price of $8,000, payable at the rate of $500 per month, all charter hire theretofore paid to be applied upon the purchase price. Finally there is an agreement or stipulation by the charterer that the barge was in seaworthy condition at the time of delivery.

Chesapeake took possession of the barge under this agreement and on or about December 15, 1936, notified Steel that it had elected to purchase the barge under the option contained in the agreement. Assuming that the charter party agreement was then in force Chesapeake undoubtedly had the right to exercise this option and upon its exercise the title to the barge passed to it. It is the contention of Steel, however, that the agreement had been breached by Chesapeake and had been rescinded by it, Steel, by reason thereof prior to the exercise of the option by Chesapeake. The agreement having been rescinded it says that it became entitled to possession of the barge, and, having taken possession on January 2d, it argues that it is entitled to retain possession thereof.

■ As I have said, it is clear that, if the charter party agreement was in force when Chesapeake exercised its purchase option, title then passed to it. Thereupon the relation between the parties became that of debtor and creditor instead of charterer and owner. United States v. Robins Dry Dock & Repair Co. (C.C.A.) 13 F.2d 808. But was the agreement then in force? This is the crucial question. To answer it we must first determine whether the agreement was breached by Chesapeake. It is the contention of Steel that it was so breached in three particulars, namely, in the incurring of unpaid liens for repairs, in the failure to maintain insurance, and in the failure to make prompt payment of charter hire.

■ So far as the repairs are concerned it is quite clear from the testimony and I have found as a fact that they were necessary and proper to remedy an unseaworthy condition which had arisen solely as the result of ordinary wear and tear. Chesapeake as demise charterer was owner pro hac vice of the barge and accordingly had the right and indeed the duty to cause such repairs to the barge to be made as were necessary to remedy unseaworthy conditions resulting from wear and tear. This is especially true since, as I have found, the weakened condition of the plates at the bow and stern which was the cause for these repairs existed prior to the date of the charter party and was, therefore, not in fact chargeable to the operation of the barge by Chesapeake. I accordingly conclude that the action of Chesapeake in incurring liens for repairs was not a breach of the charter party.

■ Nor am I able to conclude that there was a breach by reason of failure to maintain insurance. On the contrary I have found from the evidence that full insurance

was maintained on the barge up to the very moment it was repossessed by Steel. The fact that the premium on the policy covering the barge remained unpaid and that it was canceled for this reason is not material so long as insurance was actually in force.

■ The third breach claimed by Steel is that Chesapeake failed to pay charter hire on the days specified in the agreement. The latter provided that the payments should be made on the 25th of each month in advance and the fact is that, except for the first installment, no payment was ever made on time, most of them being made toward the end of the month and some in the month following. There was, therefore, unquestionably delay in making the payments of charter hire. But was this such a material default on the part of Chesapeake as gave Steel the right to rescind the agreement? I think not. The Restatement of the Law of Contracts, § 276 (a) states the applicable rule thus: "Unless the nature of a contract is such as to make performance on the exact day agreed upon of vital importance, or the contract in terms provides that it shall be so, failure by a promisor to perform his promise on the day stated in the promise does not discharge the duty of the other party."

■ Here the agreement does not itself make the time of payment of the essence of the contract or give the owner the right to withdraw the barge if the charterer fails to pay on the day fixed. I am satisfied that in this case payment on the exact day cannot be said to be of vital importance. It is obvious that failure to pay is fully compensable in damages. I, therefore, conclude that the failure of Chesapeake to pay charter hire on the exact days fixed in the agreement was not such a material breach of the agreement as entitled Steel to rescind it. I further conclude that, even if it were held to be such a material breach, Steel waived its right of rescission by its conduct in continuously accepting delinquent payments of charter hire for a period of more than six months before it attempted to rescind. Restatement of the Law of Contracts, § 300.

■ It follows that the agreement was in full force and effect on December 15th, and that Steel's attempted rescission of it on and after that day was of no effect. Consequently the exercise by Chesapeake on or about that date of its option to purchase the barge was effective and vested title to the barge in that company. I am, therefore, constrained to hold that Chesapeake was entitled as owner to the possession of the barge on January 2, 1937, and that the recapture of it by Steel on that day was wrongful. Certainly Steel had no legal right to take the law into its own hands and retake the barge by force. Nor had Steel a right in any case to withdraw the barge without permitting Chesapeake to unload her remaining cargo. Luckenbach v. Pierson (C.C.A.) 229 F. 130. Furthermore Steel's acceptance of overdue charter hire rendered its notice of cancellation ineffective. Poor on Charter Parties (2d Ed.) p. 24. Chesapeake is, therefore, entitled to have the barge returned to it.

At the time the barge was taken away by Steel there were carried away with it certain items of equipment belonging to Chesapeake as well as a substantial quantity of oil with which it was loaded. Chesapeake is, therefore, entitled to damages from Steel for the unlawful conversion of this property. The decree will accordingly provide for a reference to a commissioner to determine the amount of these damages.

■ Although Wheaton and Fisher were joined as defendants it is clear that they acted throughout only as officers of Steel and not on their own account. The libel should, therefore, be dismissed as to them.

What has been said disposes of the cross-libel filed by Steel for damages for detention of the barge in the hands of the marshall during the pendency of this suit and for the cost of reconditioning and repairs. Since Steel was not entitled to retake possession of the barge it is obvious that it is not entitled to damages for its loss of possession after she was seized by the marshal. The cross-libel must accordingly be dismissed.

### Conclusions of Law.

Chesapeake was entitled to the possession of the oil barge U. S. 219 on January 2, 1937, and Steel was not entitled to the possession thereof on that day.

The recapture of the barge by Steel on that day was without right and unlawful.

Chesapeake is entitled to a decree directing that possession of the barge be restored to it.

Chesapeake is entitled to a decree against Steel for damages for the value of the equipment and cargo which were on the

barge on January 2, 1937, when it was taken possession of by that corporation.

John M. Wheaton and John H. Fisher acted in the transaction solely as officers of Steel and the libel should be dismissed as against them individually.

The cross-libel filed by Steel should be dismissed.

A decree may be entered in accordance with this opinion.